(83 South. 73)

No. 23291.

CIACCIO v. CARBAJAL.

(June 30, 1919. Rehearing Denied Oct. 14, 1919.)

*(Syllabus by the Court.)*

1. LANDLORD AND TENANT ⟜134(3)—RIGHTS OF TENANT ON LEASE OF RESIDENCE.

The lease of a residence contemplates the housing therein of the family of the lessee, the entertainment of his guests, and the entry therein of all persons whose relations with the occupants, whether of business or otherwise, require, or reasonably call for such entry.

2. LANDLORD AND TENANT ⟜167(3)—RIGHTS OF THIRD PERSONS ENTERING PREMISES.

Third persons, occupying or entering leased premises, in the right of the lessee—as members of his family, guests, or callers—acquire no greater rights (than the lessee), as against the lessor, with respect to injuries that they may sustain by reason of his failure to make repairs for which, under the lease or the law, he may be bound.

3. COURTS ⟜95(1)—COMMON-LAW DECISIONS OF LITTLE WEIGHT IN LOUISIANA.

The civil law, with respect to the rights of landlord and tenant, being essentially different from the common law, the decisions of the courts administering the common law can throw but little light upon questions involving such rights, arising under the law and to be determined by the courts of this state.

4. LANDLORD AND TENANT ⟜168(1)—RIGHT OF TENANT TO RECOVER FOR PERSONAL INJURY THROUGH LANDLORD'S FAILURE TO MAKE REPAIRS.

A lessee, who reports to his lessor that the leased premises are in a dangerous condition, for lack of repairs which it is the duty of the lessor to make, and which he promises to make, and who thereafter sustains personal injury by reason of the failure of the lessor to make the repairs, is not necessarily precluded from recovering damages for such injury, either because of his failure himself to make the repairs or upon the ground of his having voluntarily subjected himself to the known danger. His right to recover, in such case, depends largely upon his appreciation of the character and imminence of the danger and the extent to which the negligence of the lessor may have operated to compel him to accept the risk.

Appeal from Civil District Court, Parish of Orleans; George H. Théard, Judge.

Action by Anna Ciaccio against Bernardo G. Carbajal. Judgment for defendant and plaintiff appeals. Reversed, and judgment granted for plaintiff in a certain sum, with legal interest from judicial demand.

Woodville & Woodville, of New Orleans, for appellant.

Carroll & Carroll, J. P. Baldwin, and Nicholas G. Carbajal, all of New Orleans, for appellee.

Statement of the Case.

MONROE, C. J. This is an action in damages, by the wife of a tenant against his landlord, for personal injuries sustained in consequence of her having fallen while descending certain steps leading from the kitchen of the leased premises to the yard,

which fall, she alleges, was caused by imperfections in the steps, attributable to the landlord's negligent failure to put them in safe condition, after notice. The leased premises consisted of one side of a double tenement, the kitchen pertaining to which was in a separate building, on the rear line of the lot, about 15 feet from the residence, and which, having been elevated, for rat-proofing purposes, was provided with the steps in question, composed of two side pieces (or "horses," as they are here called), connected by three planks, called "treads," in the horizontal plane, but without "risers" or planks in the perpendicular plane, save (perhaps) a narrow strip, extending from one horse to the other, several inches below the projecting edge of the lower tread.

It is alleged in the petition:

"First. That the said steps were originally badly constructed, as the same were too steep and improperly adjusted to the building.

"Second. That the lumber used in the construction of said steps was too thin and weak to safely support the weight of the ordinary person.

"Third. That the piece of lumber, serving as the tread on which your petitioner stepped at that time, was cracked, worn, and weakened, and was dangerous and unsafe.

"That the defendant herein had been notified of the dangerous condition of said steps, and had repeatedly promised to have the same rebuilt, but constantly failed to do so until after the said accident.

"That the said steps needed rebuilding in order to make them sound and safe, that the same were a part of the building leased by the defendant to petitioner's husband, and that the repairing or rebuilding, necessary in order to make said premises reasonably sound and safe, were such repairs as, under the law, the said landlord and defendant herein was under obligation to make."

Defendant denies, "for lack of sufficient information to justify belief," the allegations of specified defects in the steps, and denies, without qualification, the other allegations above quoted.

The testimony adduced on the trial is conflicting in some respects, but there is no material conflict in that given by plaintiff and Miss Kate Corcoran as to the fact and circumstances of the accident, and they, we conclude, were the only persons who saw it; another witness (one Hau), called by plaintiff, who professes also to have seen it, having, as we find, arrived on the scene after the occurrence. According to the testimony of plaintiff and Miss Corcoran, the Ciaccio family (including Miss Corcoran, who was staying with them) had finished breakfast in the kitchen on Sunday morning, April 2, 1916, and all of them (meaning Ciaccio and five children) had left that apartment, when plaintiff started into the yard, holding a pot in her hands, in which she intended to obtain water to be heated on the stove, and in descending the steps leading from the kitchen door into the yard (the elevation of the door being about three feet) she fell—her testimony on that point being as follows:

"As I put my foot on the second step, the step broke with me and I fell to the ground, and after that I don't know anything more until I was taken up by Miss Corcoran and Mr. Hau."

She further testifies that, on the following day (having, in the meantime, had her broken arm attended to at the Charity Hospital), she went into the kitchen, and further as follows:

"Q. With respect to the step, which you say was broken, what did you do? A. I made it my business to be very careful; I stepped over it. Q. Where was the broken piece, at the time [the contention on behalf of plaintiff being that a strip about four inches wide was broken down, and practically off, from the front edge of the tread of the second step]? A. It was on the ground; it was hanging—like that; broke off clean, just hanging on the edge; broke off, you would say; just hanging. * * * Q. Was any part of the broken piece touching the ground? A. All was touching the ground, but the little piece holding it up."

She further testifies that she disengaged the strip and threw it on the ground.

Miss Corcoran's testimony on that point reads:

"I was in the kitchen. She took a pot in her hand, and, as she put her foot on the second step—the step was slanting on it; it had a large crack in it—she fell and struck her face. [Shown a photograph and questioned:] A. Yes, sir; when she put her foot down on that step, *this* hung down—one nail gave out and the other nail stayed."

On cross-examination: "That step had just a crack, like that, and as she put her foot on the step, this part gave way, and hung down, and down she went. * * * It started down; one nail was protecting the one side and came out on the other side that laid down. * * * No, sir; it didn't fall off entirely. Q. Now, when you went to leave the kitchen, in order to assist Mrs. Ciaccio, did you step on the second step? A. No, sir. Q. What did you do? A. I stepped on the first step and jumped down, to try to catch her when I seen her fall; but she fell before I could catch her."

The theory of the defense is that this suit is in the nature of what the counsel call a "frame-up," which is thought to have been suggested by Hau (who styles himself a detective, or special officer), and the following circumstances and testimony are relied on, to wit:

On April 3d Ciaccio addressed a note to defendant, reading:

"Mr. Carbajal: Please call around the house at 543 S. Roman St.; the step in the kitchen broke, and my wife fell down and broke her arm."

The note was not delivered until April 7th, and upon that day defendant called at the Ciaccio house, taking with him a negro employé named Harvey Smith (or Sanders), and he testifies that, after being detained at the door for some time, a boy made his appearance, who gave him some impudence, but that they finally gained admittance to plaintiff's bedroom, where they found her in bed; that he told her he wished to go into the yard in order to see the step, but was informed that her husband had left word ("strong orders") not to allow him in the yard. He admits that the back door of the room opened into the yard, and that there was also a window, but, though he had practically forced himself, with his negro laborer, into plaintiff's bedroom, he testifies that he could not go out, through the back door, against her prohibition, and that he could not look through the window, because it was curtained; and so, leaving word for Ciaccio to call on him, he went away. He further testified that Ciaccio called that evening, and told him what had happened, but said that he made no claim; that he made an appointment with him to call at the house the next day; that he called the next day (taking with him his carpenter) and, being asked what he found, he replied:

"I found that the middle of the step was split open and thrown out; the lumber was loose, where they probably forced it open. We looked around and found another piece that they had thrown on the side of the step there. The carpenter said, 'All right.' He looked at it, and I looked at it, examined it thoroughly. What conclusion did we come to? To renail the same piece, which was torn open from the horse, and put it back there. That was all that was necessary. * * * The steps were perfectly safe, as they are now. And we went out. * * * And later on, somewhere about November, * * * I passed by that street, and in the main house is a window—front door and window—and there was hanging from one of the hinges, upstairs there, a batten blind, and from the bottom it was quite a distance, and I thought that that thing might fall and hurt somebody on the head. * * * Q. To get back to the steps, the man you had with you, was that the colored man who testified? A. No, sir; that man had no sense at all; a real carpenter. Q. What is his name? A. James Dyson. * * *

"Q. Have those steps been changed any since they were repaired? A. No, sir; anything to the contrary is untrue. Never, to my knowledge; no, sir. Now, finishing with that—I call the blind, window—I sent a man, not this one here, the next day, to have that place fixed. * * * Q. And those steps have never been changed since then? A. Never been changed, to my knowledge, since then. Q. With the exception of putting back that piece that was taken off? A. We nailed the piece that they pried off at the time of the accident. Q. These

are the same steps? A. The same steps; the same lumber."

The negro Harvey (called "Smith" by defendant, but who gave the name "Sanders" when placed on the stand) testified that he was working for the government. Asked in what capacity, he replied:

"Doing sanitary work, or cleaning—you know; furnishing paper for toilets and cleaning out."

He made quite a mess of the story that he undertook to tell, and when he had finished the learned trial judge remarked:

"I don't believe a word that witness is saying."

And defendant, who then took the stand, expressed the opinion that he was a fool. James Dyson followed the defendant in giving his testimony, and said that he had been in defendant's employ, as a carpenter, for 14 years (defendant, it may be here stated, had testified in answer to a question from his counsel, that he owns 170 houses such as that occupied by plaintiff and her family), and that defendant told him of the accident, that the steps had broken down, and that they went to the house together and found the strip split off from the tread; that it was a brand new split, as if split by some one hammering, or something like that; that he nailed it back in its place; that both the tread and the horses were perfectly sound— "brand new stuff"—and that, after that, he had never touched them.

Defendant had previously called to the stand two other negroes (besides Harvey); one of them, Virginia Dominic, being the wife of the lessee of the tenement house next door to that of the Ciaccios. She was living there when the accident occurred, as also three years later, when she gave her testimony, though she admitted reluctantly that, shortly before the accident, they had been notified to leave; that (more reluct-

antly) they had been twice notified, and (still more reluctantly) had received three notices; also that, since the accident, although behind in their rent, they have not been annoyed in that way. She testified that she first learned of the accident when, on the same day, Mrs. Ciaccio came from the hospital, and, from her kitchen window, called witness to the fence, which separated their back yards and told her that she had broken her arm, that she had slipped down on the steps, but that she said nothing about the steps having broken down; that witness, from her position on a ladder leaned against the fence, could see the steps, and that "it [without designating the particular step] was split, something like this [witness points to the wind shake in the last or third step of the Dominic steps as shown by a photograph]," but that it was still in its place, lying flat.

The other negro, Nathan Walters, testified that he is a cousin of Virginia Dominic, and, as we understand, was staying at her house, and that he, too, was called by plaintiff on the day of the accident, and told that she had slipped on the step; that, though he could see and hear her without doing so, he got on the ladder, in order that she might show him her arm, from her kitchen window, and that, while there, he saw the step with the crack in it, but still in its place, lying flat.

Mrs. Ciaccio testifies that, after returning from the hospital, where both bones of her forearm were found to be fractured, and the arm was put up in a plaster cast, she did not again go into the kitchen on that day; that she did not see the Dominic woman for a week or more; and that, when she did see her, their conversation consisted of the remark by her, "You remember the steps I told you about would break somebody's neck;" the answer by the Dominic woman, "I said it would break somebody's neck;"

and the response by the witness, "Come and see what it done me; it broke my arm." She denies that she, at any time, had any conversation with Walters about her arm.

The proceedings in the case, on July 22d, closed with Dyson's testimony, to the effect that he had nailed back in its place the strip that came off the tread of the second step, and had not thereafter touched the Ciaccio's steps, and the case was continued until the following day (July 23d); the testimony taken on that day being preceded by the following:

"Note.—Before the testimony was resumed on this day, two sets of steps were brought into the courtroom."

Of the two sets thus referred to, it appears that one had been brought from the tenement which had been occupied by the Ciaccios and the other from that which had been, and was still occupied by the Dominics; and, as the Ciaccio steps failed to disclose a tread from which a strip had been split off and renailed in its place and did disclose some material and work which were not on them when Dyson and defendant had last seen them, Dyson was recalled and gave some rather confused testimony, admitting, however, that something had been done to the steps since he nailed the strip on; and then defendant called to the stand W. T. Murrell, who testified that he had worked for defendant, about 20, or maybe 26 or 27, years before, and had again worked for him "lately," beginning in November, 1916; that defendant, in that month, sent him to the premises 543 South Roman street, "for the purpose of fixing a window"; that (quoting):

"He was passing; he told me to go there; he saw a window, or shutter, hanging down in the front. I went there and fixed that. There was a little work to do on the front gate, leading to the street—there is a fence in front—and I fixed that, and put a piece on the post and fixed the gate up, and the lady called my attention to a closet door being down, in the back yard. I

fixed that. And I fixed the step—there were two places ragged on the outer edge, and I had some lumber left over from Galvez street, and I took the two pieces off and put on new ones. Q. Do you recognize these steps which we will call 'Ciaccio,' as the steps you refer to? A. Yes, sir. Q. Did anybody call your attention to it, or did you do it yourself? A. I did it myself. * * * Q. Which two planks did you put on? A. This one here and that one [referring to the second and third steps]. Q. Did you touch the second step at all? A. No, sir; it had a ragged edge, projecting over, and I took these pieces over and used them. Q. What is this piece I have my finger on, running *transversely* and under the tread? A. That is a riser. Q. Did you put those on? A. Yes, sir. Q. Why? A. Because *it projected out a little too far*, and I did that for the looks. We usually do that anyhow. I had those pieces, and I wanted to get rid of them more than anything else. Q. The treads you put on project, and you put those pieces under? A. Yes, sir; that is my style of making the step. Q. Did you have any instructions from anybody to do that? A. No, sir; I did that on my own account; my instruction is to leave that to me. * * * Q. You say they [the treads that he removed] were sound, and yet you stated that they were ragged at the edge? A. Yes, sir; at the edge, they became ragged. They were outside steps in the weather. Going up and down and carrying loads, it became ragged on the outer edge. They looked bad and rough. I had the two planks and took them off. * * * Q. Split, you say? A. On the outer edge, one was split in the middle; still it was nailed on solid; it wasn't injured at all."

He also testified that the planks (treads) that he took off were left in the yard.

The production in court, on July 23d, of the Ciaccio steps, of itself demonstrated that changes had been made in them subsequent to April 8, 1916, when the strip belonging to the tread of the second step was nailed back in its place, and we do not find that, as to the defendant, the testimony of Murrell betters the situation as thus brought about, Murrell, apparently, would have the court believe that, having been instructed by defendant to go to the Ciaccio house and fix a window, or a swinging blind (and he should have known which, since the two things are

quite different and would be apt to require different equipment), he took it upon himself to do various other things which, in his opinion, needed, or deserved, to be done, including the substitution of new treads, in place of the old ones, upon the kitchen steps, and the supporting of the treads by transverse pieces, or cleats, nailed across the horses beneath them. But that work having come upon him unexpectedly, it was in order for him to explain how it happened that he carried the lumber for the new treads and the cleats with him; or, if he means to say that, when he found that it was needed, he went back to Galvez street for it (and in any event), he should have explained how he accounted to defendant for the time and material expended by him in doing things that he had not been instructed to do, since it is not easy to believe that a man who has become the owner of 170 such houses as that occupied by the Ciaccios could have done so while paying carpenters by the day, or otherwise, and leaving them to expend the time thus paid for and his material without instructions from him or any subsequent accounting. There was no reason, however, even if he acted without instructions, why Murrell should have kept secret the work done by him, and as there is every reason to suppose that he told defendant, or that defendant knew, without being told by him, how he had earned his wages, before he received them, we conclude that it was within the knowledge of defendant and within the reach of his memory, if he had chosen to exercise it, when he testified in this case, that Murrell had done the work in question, and hence that his statement that no such work had been done, to his knowledge, was not founded in the facts.

Mrs. Ciaccio's testimony as to the notices and demands that she made on defendant personally, and on his collector, with regard to the steps, is quite positive and reads, in part as follows:

"Q. How many times did you notify the collector? A. In fact every time he came to collect the rent; and also about a window. Q. Now you say you also notified Mr. Carbajal in person; can you fix the time? A. No sir; but I know when I paid him the rent. Q. Is it not a fact—what did Mr. Carbajal answer you, when you told him? A. He said, 'I will attend to that; I will have that fixed for you.' I said: 'All right, do so; if you don't, it will cause somebody to break their neck.' He said: 'That is all right; I will attend to it.' * * * Q. And twice you told Mr. Carbajal in person? A. Yes, sir. Q. Where did the second interview between you and Mr. Carbajal take place? A. On my front steps; he knocked at my door, like any landlord; I went to open the door; he asked for the rent; I gave it to him, and told him about the steps. * * * Q. I understood you to say that you repeatedly told the collector about the steps? A. Yes, sir; nearly a dozen times; maybe more. Q. And twice you told Mr. Carbajal in person? A. Yes, sir. * * * Q. Did you tell Mr. Carbajal the steps were dangerous? A. I told him those steps was dangerous, and I told him I was a big, heavy woman, and they were not the steps for a woman of my size to go up, and, if he didn't fix them, it would cause a terrible lot of trouble. He said, 'I will attend to it,' and he never did, until the next October, when my arm was broken. Q. Did you actually tell him that the steps were dangerous? A. I told him that the steps were broken, and they were not any steps, to begin with; it was simply like a little camp step—like a bathhouse going in the water—on a pitch, like this and this was decayed underneath, and it had a crack in it. I showed him the crack in it, and I showed the collector the crack, and he said he would have it attended to."

Mr. Carbajal, while being examined on July 23d, gave the following testimony:

"Q. It has been testified that your collector was notified that these steps were dangerous; did you ever hear of that? A. No, sir; never did hear. Q. It was also testified by Mrs. Ciaccio that on two occasions she mentioned those steps to you, and that on one occasion you promised to have the matter attended to? A. I never saw her; I never collected the rent from her. All that is false."

Defendant's collector was not called as a witness, and the determination of the question of notice vel non depends upon whether the testimony of plaintiff or that of defendant is accepted.

In general, all other factors being equally balanced, affirmative testimony to specific facts is more to be relied on than mere denials; since, in the one case, unless the facts exist, the witness must invent them, and thereby commit deliberate perjury; whereas, a mere denial of a fact, supposed to be within the knowledge of a witness, may involve nothing worse than a lapse of memory.

In the instant case, it having been demonstrated that the plaintiff's testimony, to the effect that the steps in question were rebuilt or repaired after the nailing on of the strip, in April, 1916, was true, and that defendant's emphatic denial that any such work was done, to his knowledge, and his denunciation of all statements to that effect as untrue, were themselves (stating it charitably) based upon a failure on his part to exercise his memory, we can see no sufficient reason, in view of plaintiff's testimony to the contrary, for accepting, as any better founded, his denial that he ever saw the plaintiff, or collected the rents, or received notice of the defective condition of the steps, or promised to attend to it, or his denunciation as false of all testimony to that effect. We therefore find as facts that the steps in question were too steep for safety; that the tread of the second step was split about four inches from its front projecting edge and was otherwise unsound; that the projection was unusual and was too great; that defendant's attention was called to the pitch of the steps and to the crack in the tread, and that he promised to attend to the matter; that he failed to do so until after the plaintiff received her injuries; and that the injuries are attributable to the fact that when, in going down the steps, plaintiff, being a large, heavy woman, placed her foot upon the tread of the second step, the outer edge, beyond the split or wind shake, gave way, and she was precipitated to the ground.

There is no conflict in the testimony as to the extent of her injuries. In falling, her head struck the ground, upon which small shells, or pieces of shell, were scattered, and a piece of shell was driven into her face and left a scar which was visible more than two years later, when the case was tried, and two bones, between the elbow and wrist, of one of her arms, were broken. She went immediately to the Charity Hospital, where the arm was put up in a plaster cast and so remained for nine weeks. As to its condition, after a lapse of more than two years, and her suffering in the meanwhile, she gives the following uncontradicted testimony, to wit:

"I have no use of it at all; I can't raise a pot, or wring out clothes, or nothing. Before that, I could wring out the wash. Now, I can't do anything. You can see there. * * *

"Q. How long were you laid up, altogether? * * * How long were you laid up in the house, before you could go around? A. Really, about 11 months—laid up with it. Q. Did you suffer much during that time? A. I guess I did; I couldn't go to sleep; the doctor had to pump stuff in my arm, and give me white stuff, to put me to sleep."

It was admitted that the surgeon who treated the arm was serving in France, in July, 1918, when the case was tried, and that his testimony could not be obtained. Another surgeon, who examined the arm during the trial, gave the following, with other, testimony:

"Q. Has she the use of that arm to-day that you say she had prior to that fracture? A. No. Q. To what do you attribute the present condition of that arm? A. To the fracture. Q. Does it appear that there has been a complete knitting of the bones? A. Yes, sir; * * * the opposition is not in the same continuity it was before the fracture, giving some deformity; but as to the union, it is complete. Q. Then what is the cause of the weakness in the arm to-day? A. The deformity; the bones are not in the same continuity they were before. Q. In plain English, in setting the bones, they were not lined up evenly, as a layman would say? A. Yes; not lined up is a very good word."

The witness declined to say that the setting of the arm could have been better per-

formed; and expressed no opinion as to plaintiff's possible recovery of a better use of it.

## Opinion.

[1] Plaintiff was not a party to the contract of lease between her husband and defendant, but that contract contemplated the housing upon the leased premises of the lessee's family, the entertainment of his guests, and the entry thereon of all those whose relations with the occupants, of business or otherwise, required or reasonably called for it; hence she (plaintiff) was there lawfully and of right.

In Schoppel v. Daly et al., 112 La. 201, 36 South. 322, it appeared that the wife of the lessee was injured by the giving way of the floor of the room which she was occupying, which floor the lessor had but recently caused to be repaired. It was said by this court:

"The action is one ex delicto for personal injuries to the wife. * * * Her right to damages for personal injuries is distinct from his [the husband's] right to recover damages by reason of his contractual relations as lessee with Mrs. Daly. The contract of lease evidenced the fact that she was lawfully on the premises. We do not accede to the proposition that the liability of the owners of buildings for injuries resulting from their defective condition is limited to neighbors and passers-by upon the street; that it does not extend to persons who may be lawfully within the same. It may be that the occupants of the building, by reason of the character of their occupancy, may have come under some obligations as to the condition of the premises from which strangers are absolutely freed; but, if the occupants have complied with those obligations, the lessor is responsible for personal injuries received by them."

In Christadoro v. Von Behren's Heirs et al., 119 La. 1025, 44 South. 852, 47 L. R. A. (N. S.) 1161, the mother of the plaintiff had been employed by Von Behren (whose heirs were sued) to take charge of certain premises owned by him, with authority to lease them when she could, and otherwise occupy them herself, and, while she was so occupying, plaintiff, her daughter, paid her a visit and was injured, in leaving, by the collapse of a wharf over which she was passing, and which was part of the premises. It was held that she was entitled to recover for such injuries, upon the grounds that her mother had, by her contract, secured from Von Behren the right to receive visitors; that her daughter, being her guest, was rightfully on the wharf; and that the owner was liable in damages for the injuries she sustained by the collapse of the wharf, by virtue of C. C. art. 2322, which declares that—

"The owner of a building is answerable for the damage occasioned by its ruin when this is caused by neglect to repair it, or when it is the result of a vice in its original construction."

"This provision of the Code," said the court, "being nothing more than an application of the principle that 'every person is responsible for the damage he occasions, not merely by his act, but by his negligence, his imprudence, or his want of skill,' article 2316, Civ. Code."

[2, 3] It will be observed that, in both of the cases cited, emphasis is placed on the fact that the plaintiffs were lawfully and rightfully on the leased premises, and their right to be there is traced, in each case, to the contract whereby the lessor acquired the right to occupy the premises and to open them to his or her friends and guests. There is, however, a maxim of law and of common sense to the effect that no one can convey to another a greater right than he himself possesses; from which it would seem to follow that if, by contract, the lessees in the cited cases had bound themselves, or if by reason of the law, as applied to their own acts or omissions, they had become responsible, for the safety of the buildings occupied by them, and had discharged their lessors from all liability to them in that respect, they could not, by entertaining their guests, confer upon them the right to recover, from their lessors, damages which they themselves could not have recovered for personal injuries resulting from their failure to comply with their obligations to keep the buildings safe.

In other words, whatever may be the right of a person with respect to an injury sustained from a falling wall or cornice, while walking on a public highway, it is difficult to perceive lhow a third person, entering leased premises under and by virtue of the right, and the invitation, of the lessee, can acquire any greater rights against the owner than the lessee possesses. Any limitation, whether by contract or law, upon the right of the lessee, with respect to the use of such premises, must necessarily extend to those who claim under him. If a contract of lease, or the law, declares that certain leased premises shall not be used for a particular purpose, they can no more be so used by the family or friends of the lessee, claiming through him, than by the lessee himself, and so, if the contract of lease, or the law, declares that the lessor shall not be liable for injuries sustained by the lessee by reason of the nonrepair of the leased premises, the family or friends of the lessee, receiving injuries, by reason of such nonrepair, while on the premises in the right of the lessee, cannot recover that which he would have no right to recover. In order, then, to determine what are the rights of a third person, quoad a contract of lease, with respect to that which happens to him or her, while upon the leased premises, as a member of the family, or a guest, of the lessee, we must first ascertain what are the rights of the lessee. As a preliminary to that inquiry, it may be observed that, at common law,

"the general rule is that the tenant must beware. He must examine the premises before taking them, and rely upon his own examination, unless he procures a warranty from the landlord of the safety of the premises. The burden of the examination is placed on him, and not on the landlord." Note to Hines v. Wilcox, 34 L. R. A. 824 (96 Tenn. 148, 33 S. W. 914, 54 Am. St. Rep. 823).

In the case to which the note is appended, it was held that the landlord was liable in damages for defects in the leased premises which were known, or, with reasonable diligence might have been known to him, but not to the tenant, although the latter examined the premises and did not discover them. And of that ruling the annotator says:

"Hines v. Wilcox is a new departure in the law of the landlord and tenant. * * * No active care and diligence to discover defects have generally been placed on the landlord."

So, therefore, unless the courts of the common-law states are dealing with cases which are governed by statutes, or warranties, their decision can throw but little light upon the questions here at issue.

The law of Louisiana which seems pertinent to those questions is found in the following articles of the Civil Code, to wit:

"Art. 2692. * * * The lessor is bound by the very nature of the contract, and without any clause to that effect: * * *

"2. To maintain the thing in a condition such as to serve for the use for which it is hired. * * *

"Art. 2693. * * * The lessor is bound to deliver the thing in good condition, and free from any repairs. He ought to make, during the continuance of the lease, all the repairs which may accidentally become necessary, except those which the tenant is bound to make as hereafter directed.

"Art. 2694. * * * If the lessor do not make the necessary repairs in the manner required in the preceding article, the lessee *may* call on him to make them. If he refuse or neglect to make them, the lessee may himself cause them to be made, and deduct the price from the rent due, on proving that the repairs were indispensable, and that the price which he has paid was just and reasonable.

"Art. 2695. * * * The lessor guarantees the lessee against all vices and defects of the thing, which may prevent its being used, even in case it should appear he knew nothing of such vices and defects, at the time the lease was made, *and even if they have arisen since,* provided they do not arise from the fault of the lessee; *and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same.*"

"Art. 2715. * * * The lessee is *bound* to cause all necessary repairs to be made which it is incumbent on lessees to make, unless the contrary hath been stipulated.

"Art. 2716. * * * The repairs, which must be made at the expense of the tenant, are those which, during the lease, it becomes necessary to make: To the hearth, to the back of chimneys and chimney casing. To the plastering of the lower part of interior walls. To the pavement of rooms, when it is but partially broken, but not when it is in a state of decay. For replacing window glass, when broken accidentally, but not when broken either in whole or in their greatest part by a hailstorm or any other inevitable accident. To the windows, shutters, partitions, shop windows, locks and hinges, and everything of that kind, according to the custom of the place.

"Art. 2717. * * * The expenses of the repairs, which unforeseen events or decay may render necessary, must be supported by the lessor, though such repairs be of the nature of those which are usually done by the lessee."

It will thus be seen that repairs such as are here in question are not within the enumeration of, or ejusdem generis as, those which the lessee is bound to make, and hence it follows that they fall within those, the burden of making which the law imposes upon the lessor.

The past jurisprudence of this court having left some room for doubt as to the effect to be given to the language of article 2693, authorizing the lessee to make repairs which the lessor should, but fails to, make, that question was made the subject of a review in the case of Boutte v. New Orleans Terminal Co., 139 La. 945, 72 South. 513, and it was there held (quoting from the syllabus) that:

"The right accorded a lessee by article 2694 of the Civil Code to have made at the expense of the lessor, after having demanded that the lessor make [them], such repairs * * * as are indispensable, does not impose upon the lessee any obligation to make the repairs which primarily it is the duty of the lessor to make."

No doubt there have been, and will be, cases in which the mere instinct of self-preservation would demand that certain action be taken, regardless of the legal obligation of the person threatened with danger, and in which the failure to take such action would be counted as negligence, precluding the recovery of damages from the person creating or responsible for the danger. But whether that be so in a particular case depends upon the character, or rather the threatened person's appreciation of the character and imminence, of the danger.

In the instant case, as we understand the testimony, the plaintiff regarded the steps in question, which, affording as they did the only means of access to the kitchen, were in constant use by her, as dangerous, mainly because they were too steep, though she also noted that there was a crack in the tread of the second step, of which she felt some apprehension. The danger, however, whether from the angle at which the steps were leaned against the kitchen building or from the crack in the tread, was not apparently so imminent but that the steps might be used without injury to the person using them. But it required greater care than if the angle had been broader, since, in proportion as such an angle is reduced, so are the surfaces of the treads of the steps narrowed, and so is the weight of those who use them thrown upon the front edges of the treads, thereby increasing the danger of breaking off those edges if there be, as there was in this instance, a split in the tread near the edge. The building and placing of the steps, as they were built and placed, was faulty construction, of which defendant is presumed to have been informed when he rented the premises, and of which plaintiff became informed and complained after (with her husband and family) she moved in. It may be that, of itself that would not convict defendant of the negligence required to be proved in order to support this action. But the split in the tread, combined with the acuteness of the angle at which the steps were established, was another matter, which defendant was bound to consider after receiving notice of the crack, since, though the position of the

steps would remain the same, the crack was likely to become wider, until, as it actually happened, the front edge of the tread gave way, under plaintiff's weight, and she was precipitated to the ground.

[4] It is argued, in effect, that, knowing the danger, plaintiff's remedy was either to have had a new tread substituted for that which was cracked, or to have moved out of the house. It is shown that she had a sick husband and five children, and it appears from the testimony that she did the cooking and washing for the family, besides otherwise caring for them, and that they ate their meals in the kitchen. We infer that her husband is a laborer, or, possibly, a night watchman and that they are extremely poor is sufficiently evidenced by the fact that she walked five squares to the Charity Hospital to have the broken bones of her arm put in a cast and then walked home; and it appears to us that, if there was not money enough in the family to enable her to ride to or from the hospital, under those circumstances, it is not likely that they would have had any money to advance for a repair, which defendant was bound by law to make to his own property. The suggestion that she should move out is equally untenable. She had no time for house hunting, and the defendant had no right to compel her to do so, by failing to comply with his obligation; the consequences of such failure falling upon him, and not upon her. We are not to be understood as holding that one may subject himself to a danger of which he is informed, or which is obvious, and he is able to appreciate, and recover damages for the injury thereby sustained. The danger in this case was not of that character. Plaintiff knew that the crack was there, and thought it might import danger, and she called defendant's attention to it. Defendant and his carpenter, Dyson, testify that it was not dan-

gerous, and that it was impossible that the strip should have split off from the tread by reason of the crack. But Dyson also testifies that the strip was perfectly sound, and that the projection of the edge beyond the support of the horses was less than usual, while Murrell, who found it necessary, without instructions (as he says), to substitute a new strip, a few months later, testifies that the edge of the old strip was "ragged" (which we interpret to mean rotten), and that the projection was greater than usual. The crack in question was in the nature of a "wind shake," which might or might not have gone through the board; defendant had promised to attend to the matter of the steps, including the crack; plaintiff's husband and children had to be fed, and their clothes had to be washed; the use of the kitchen was indispensable; the steps afforded the only means of ingress and egress; and the danger from them did not appear to be so imminent but that they could be used from one moment to another, pending the fulfillment of defendant's promise to attend to them. Plaintiff's use of them under such circumstances was not negligent, but was the taking of an apparently slight risk, which she was compelled to assume by reason of the negligence of the defendant. Our conclusion is that she is entitled to recover; and in view of the testimony as to the condition of her arm, more than two years after the accident, and of her very great need of that use of it of which she has been deprived, we fix the damages at $2,500.

It is therefore ordered that the judgment appealed from be annulled, and that there now be judgment herein, in favor of the plaintiff, Anna Ciaccio, wife of Anthony Ciaccio, and against the defendant, Bernardo G. Carbajal, in the sum of $2,500, with legal interest from judicial demand, and all costs of this suit.