For the reasons assigned, the writ issued herein is recalled and vacated at relator's cost.

HIGGINS, J., takes no part—recused.

### ESTES v. ÆTNA CASUALTY & SURETY CO. et al.*
### No. 14980.

Court of Appeal of Louisiana. Orleans.
Nov. 14, 1934.

396

O'Niell & O'Niell, of New Orleans, for appellant.

St. Clair Adams and St. Clair Adams, Jr., both of New Orleans, for appellees.

Alex. C. Granzin, of New Orleans, for intervener.

JANVIER, Judge.

Howard Estes brings this suit seeking monetary redress for physical injuries sustained by him when he slipped and fell while walking on the brick pavement in the courtyard, or patio, which afforded access to the rear door of an apartment leased by him from Miss Alberta Kinsey, defendant.

He charges that he slipped because of the accumulation of mud and slime on the surface of the bricks and that he himself was not at fault.

The defenses relied upon are:

(1) A denial that there was any defect in the surface of the pavement.

(2) A denial that there is any duty placed by the laws of Louisiana upon a landlord with reference to common passageways and alleyways.

(3) An alternative charge that Estes himself was at fault and that this fault constituted contributory negligence.

This last defense is divided into two parts:

(a) It is asserted that Estes was negligent in that he made use of a passageway leading to the rear door of the apartment, which passageway was well known to him to be slippery and dangerous, although there was available to him another means of ingress and egress, to wit, the front door, which other route was entirely safe and not in any way beset with dangers; and

(b) That Estes was careless in stepping upon the slippery surface of the bricks without taking extraordinary precautions.

There are two defendants, Miss Kinsey, the owner and lessor, and Ætna Casualty & Surety Company, which company had issued to Miss Kinsey a policy of public liability insurance under which it undertook to indemnify and hold her harmless against claims by tenants or others injured upon her property.

The surety company is made defendant under the provisions of Act No. 55 of 1930.

The board of administrators of the Charity Hospital of the State of Louisiana intervenes, makes allegations similar to those made by plaintiff, and claims of defendants the sum of $159, alleging that, when Estes was injured, he was taken to the said Charity Hospital for emergency treatment and that a fair cost for the services rendered is $159, and which sum is itemized by intervener as follows:

| | |
|---|---|
| Ambulance, | $ 5.00 |
| Open reduction of fractured patella under spinal, | 150.00 |
| One day hospitalization, | 4.00 |
| | $159.00 |

Alleging that by reason of the provisions of Act No. 230 of 1932 intervener is entitled to claim the said sum, it seeks solidary judgment against the defendants.

In the district court there was judgment against plaintiff and against intervener, and both petitions were dismissed.

The defense which we have numbered 2 and which is based on a question of law—the liability, vel non, of a lessor for injuries sustained as a result of defects in common passageways, hallways, alleys, etc.—is raised in the following language: "That said yard constituted no part of the rooms rented to plaintiff and your defendant was under no duty or responsibility with respect to said court yard."

This defense must be first considered because it resembles an exception of no cause of action, and, if the contention of defendants on this point is held to be sound, then there can be no recovery.

In Glain v. Sparandeo, 119 La. 339, 44 So. 120, 121, the Supreme Court of Louisiana said: "The lessor, we think, is as much bound for the safety, for ordinary use, of the necessary approaches and exits to and from the apartments which he lets as for the safety of the apartments themselves. The exception of no cause of action was therefore properly overruled."

Since, in that case, that question had been squarely raised by exception of no cause of action, we find no opportunity to doubt that the court considered it, and feel that it was intentionally passed upon before consideration was given the other questions which were involved.

Indeed we can find no reason under the laws of this state for relieving the lessor of his obligation to tenants and others lawfully using common alleyways, passageways, etc. In fact, we feel that the obligation to maintain in safe condition those portions of the lessor's property which may be used in common by all of his tenants rests more heavily upon him than does the similar duty with regard to those portions which are turned over to tenants for their exclusive use. In the latter case each tenant has the privilege, under certain conditions, of making necessary repairs himself, if the lessor fails to do so. R. C. C. art. 2694. But, where alleyways, courtyards, etc., are involved, we know of no right in any tenant to do anything except rely exclusively upon the landlord.

That, in this state, the duty of maintaining his property in a safe condition is placed squarely upon the lessor, there can be no doubt. This obligation results from Civil Code, art. 2695, which reads as follows: "The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since. provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same."

We recently commented upon the law of this state on this question, and expressed the view that " * * * the jurisprudence of this state on the question of the obligation of a landlord to a tenant has been uniform, and there has been no departure from the well-recognized rule that to all intents and purposes a landlord is the insurer of the safety of the tenant, and that he is responsible for all damage caused to the tenant by reason of the defective condition of the property, and this regardless of whether the defect is apparent or is latent, or whether it is of a minor nature. In fact, the sole defense remaining to a landlord where he is sued for damage caused to a tenant by defective condition of the property is contributory negligence on the part of the tenant." Hanover et al. v. Brady (La. App.) 143 So. 267, 268.

It is unnecessary to review here the many cases on which we based our conclusion as above expressed. We do refer, however, to Lasyone et ux. v. Zenoria Lumber Co., 163 La. 185, 111 So. 670, 672, and to Klein v.

Young, 163 La. 59, 111 So. 495. A reading of those decisions and of the many cases cited in them brings conviction that, where there is a defect and an injury follows, the lessor is liable unless there was contributory negligence on the part of the injured person. In the Zenoria Lumber Company Case the court, after discussing many of the defenses made in earlier cases, such as that the lessor did not know of the defect, that the defect did not result from the apparent ruin of the building, that the defect was trifling and inconsequential, and many other defenses, summed up its statement of the law on this question in these words: " * * * The cases referred to supra hold, in effect, that the obligation of the lessor is to have and to keep his building safe for occupancy."

This civil law principle, that the lessor is responsible for damage caused by defects in his property, is the reverse of that which exists in practically all common-law jurisdictions. In the Zenoria Lumber Company Case our Supreme Court also said: " * * * It is sufficient to say that under the civil law the rights of landlord and tenant are radically different from what they are under the common law."

This difference is interesting for the reason that, even under the other systems, under which the rule is that the tenant takes the leased premises subject to its defects, there is a recognized exception in the case of those parts of the lessor's property used in common by different tenants, or used in common by the tenant and the lessor himself. In 25 A. L. R. 1273, there appears an editor's note to the case of Roman v. King, 289 Mo. 641, 233 S. W. 161, in which are cited nearly 200 cases from many jurisdictions, all recognizing this exception to the common-law rule. In the words of the note: "To the rule that a tenant takes the leased premises subject to defects not amounting to a trap, there is an exception to the effect that the owner of a building who leases it to different tenants, and expressly or impliedly reserves portions thereof, such as halls, stairways, porches, walks, etc., for the use in common of different tenants, is liable for any personal injury to a tenant, or a person in privity with a tenant, due to defects in the portion of the leased premises of which the landlord so retains control, provided the defect is ascribable to the negligence of the landlord, and the tenant or person injured is not guilty of contributory negligence."

In a most recent treatise on the subject, American Law Institute's Restatement of the Law of Torts, vol. 2, p. 976, § 360, the principle is thus stated: "A possessor of land, who leases a part thereof and retains in his own possession any other part which the lessee is entitled to use as appurtenant to the part leased to him, is subject to liability to his lessee and others lawfully upon the land with the consent of the lessee or a sub-lessee for bodily harm caused to them by a dangerous condition upon that part of the land retained in the lessor's control, if the lessor by the exercise of reasonable care could have discovered the condition and the unreasonable risk involved therein and could have made the condition safe."

It will be noted that in this statement there are two conditions upon which the lessor's liability is made to depend in common-law jurisdictions:

(1) Knowledge, actual or constructive, of the defect.

(2) Ability to repair the defect.

In this state liability cannot be made to depend upon either of these conditions, because the codal article in no way takes into consideration either lack of knowledge or lack of ability to repair.

We have already shown that the lessor's obligation in this state results from R. C. C. art. 2695. This article is practically identical with article 1721 of the Code Civil Français (Code Napoleon), and therefore the comments thereon by the French commentators will be of help to us in determining whether the obligation extends to such parts of the property as are provided for the joint use of all tenants. We find, in Contrat de Louage, vol. 20, p. 229, a discussion by Baudry-Lacantinerie of this question, and we note with interest the following statement of the law as translated in the brief of appellant:

"The enjoyment must be guaranteed to the tenant, not only of his apartment itself, but also of the accessories, such as the entrance, the janitor's lodge, the courtyard, the stairways, the cellars, the water wells.

"The tenant, having the right to use not only the principal thing, but also the accessories, his enjoyment must be guaranteed of the latter as well as of the principal thing.

"Among the accessories must be included the common parts of the property, those of which the tenant has the enjoyment with other tenants. We can mention:

"The Courtyard. The landlord cannot prevent the tenant of an apartment from going over the courtyard of the people of the house, at whatever hour. Moreover, he cannot pre-

vent the tenant from bringing into the common courtyard the carriages of his guests or his own, at whatever hour. Nor can he divide the common courtyard by a fence. He is bound to keep up the common courtyard. He cannot erect any construction there. He cannot prevent the tenant from unloading his goods there, if the courtyard has that destination."

See, also, Huc, vol. 10, p. 409; Colin et Capitant (6th Ed.) vol. 42, p. 532; Planiol et Ripert (1932 Ed.) vol. 10, p. 656.

But even if we had not before us the illumination which is thrown upon the subject by the French commentators, nor the significant action of the common-law courts in holding liable, for defects in common passageways, lessors who are not liable for injuries sustained on other parts of the property, we feel that we would independently have reached the conclusion to which we have come and which is that the lessor's duty, which is defined in our Civil Code, extends to those parts of the property which are provided for the joint use of all the tenants, or for the joint use of one or more of the tenants and of the lessor himself.

If the lessor is to be made liable for defects of which he has no actual knowledge and which exist in the property turned over to the tenant and placed under his sole and exclusive control, we can see no reason to relieve him of responsibility for defects in that part of the property over which he retains control and supervision and over which the tenant is given no right except that of use in common with others. The reasons, among others, which prompt us to feel that the lessor should be held liable in such cases, are set forth in Ruling Case Law, vol. 16, p. 1038: "The landlord is in possession of these commonly used portions of his building. He has not parted with dominion over them. He has right of access to them at all times, and the right to exclude the loitering public generally from them."

We pass to a consideration of the other defenses, and thus find it first necessary to consider the facts involved.

The apartment leased by Estes from Miss Kinsey is located on Royal street in that section of New Orleans known as the "Vieux Garre." It has a front doorway on Royal street and a rear entrance opening into a courtyard, or patio, which is at the rear end of an alleyway, which, at its front end, opens on Royal street alongside the Estes apartment. At the rear of the courtyard there is another structure containing other apartments, some of which are occupied by other lessees and one by Miss Kinsey herself. The entire property, apartments, courtyard, and alleyway, belong to Miss Kinsey, and the courtyard and the passageways were used in common by her and by all of her lessees.

The rear entrance to the Estes apartment opened into the courtyard only a few feet from the point at which the alleyway connected with it. Over that part of the courtyard there was an upper porch, a portion of which was roofed so as to form a cover or roof for the kitchen of the Estes apartment.

About four years before the accident Miss Kinsey had resurfaced with old bricks that portion of the courtyard and had constructed it in keeping with the general tone of the other part of the courtyard, and, we may say, with the general appearance of that quarter of the city. There were flower beds raised somewhat above the surface and the whole area drained towards a point only a few feet from the rear door of the Estes apartment, where there was located a drain which led to the street. There is no room for doubt that this drain was not of sufficient size to adequately and promptly permit the flowing off of rainwater whenever there was an extraordinary downpour. The record shows that, as a result, quite frequently earth was washed from the flower beds and also worked its way up through the bricks, so that there was quite an accumulation around the rear door of the apartment in question.

The porch above also leaked, as the evidence conclusively shows, and as a result there was considerable dampness; there being little opportunity for sunlight to penetrate into that portion of the yard. Because of these facts and because the bricks were not waterproofed or connected to one another by cement or concrete, there had grown at that spot quite a lot of green fungus, which was quite slippery.

As to the drainage, Miss Kinsey herself said: "It has a bad place and it is lower than the rest of the places and it don't drain."

It is true that she said that "when everything in New Orleans floods the water does not go off immediately and, if there is a little sediment left, I turn the hose on it and it goes off immediately."

Mrs. Young, one of the other tenants, testified as follows: "Whenever it rained it was muddy and slimy. It did not drain properly. * * *"

She also said that "the bricks were crooked and it was muddy and slimy at the time. * * *"

In the testimony of Labuzan, the brick mason who had relaid the bricks a few years before, we find the following:

"Q. Do you know anything about the condition of the premises at the present time? A. No, sir.

"Q. Labuzan, in putting that brick in there was it your intention to make the condition of that part of the premises to conform to the condition of the premises in general— A. The condition of the premises in general—

"Q. I will ask you the question another way. Did you use old brick? A. Yes.

"Q. Why did you use old brick? A. To correspond with the rest of the yard. ·

"Q. Was that done at Miss Kinsey's request? A. Yes, sir.

"Q. Is it not a fact, Labuzan, that brick and particularly old brick laid in the manner in which you laid this brick, has a tendency in damp weather to become covered with a green slime? A. With a green slime, yes sir.

"Q. That is true? A. Yes, sir. * * *

"Q. Is it not true, Labuzan, when bricks are laid in the manner as these were laid, that mud has a tendency to accumulate between them? A. Mud has a tendency to accumulate between them, yes sir."

Mr. Estes, plaintiff, made the following statement: " * * * I walked across that porch and two steps down into the courtyard, and on the second step, with my left foot, it slid on the mud and slime that had accumulated on those bricks in the courtyard and my foot flew out from under me. * * *"

Mrs. Estes, with reference to the condition of the bricks at the time of the accident, said:

"A. They were slimy. They were muddy and slimy, and there were pools of water between the bricks.

"Q. You mean they had water in the little spaces— A. Where the bricks fall down, yes.

"Q. Could you see the bricks distinctly, or were they so covered that you couldn't see them? A. You could see some of them and some of them were covered with water and some of them were covered with mud."

Dr. Young, another tenant, testified as follows: "The courtyard is made up of old bricks with a slime on the bricks and it was not swept very often and it was never kept very clean and my wife swept it after the acci-

dent, but it was never swept before and the grass would grow up in between the bricks, which would make it worse and there was a tree in the center and the leaves falling from that tree would make it hazardous."

Dr. Love, still another tenant living in another one of the apartments, testified as follows: "The courtyard was paved with brick which was not laid in any fashion, but put down in a helter skelter fashion. Some of the bricks were loose and not tied down and the yard was damp and muddy and débris would fall from the tree and fall in the yard and it was pretty hard to get around in and I had to carry a flashlight to get around at night and it was hard to walk on."

We can reach no other conclusion than that there was something defective about the condition of the courtyard which resulted in the almost constant accumulation of mud and the growth of fungus, and that these together made it somewhat dangerous to the pedestrian traversing that portion in which such conditions existed. Nor can we find that on the morning in question the condition was only temporary. It may be that a landlord, whose duty it is to keep clean and free of obstructions common passageways, is entitled to a reasonable time, after extraordinary downpours, to clear off mud or other slippery substances which accumulate. We do not now consider this question, but we do find that it was customary for such conditions to exist in this courtyard and at that spot.

■ There is thus presented for our consideration a most interesting question. As a part of her denial that the condition of the yard at that spot constituted a defect as a matter of law, Miss Kinsey contends that, when Mr. Estes contracted to rent her apartment, he was induced to do so by the picturesque, historic, and antique beauty and atmosphere of the place, and that the conditions of which he now complains were themselves among the influences upon which he acted in choosing that spot for his home.

It is argued that, if a tenant desires a particular type of building, or a particular type of pavement in his yard, or if, for æsthetic reasons, he prefers old bricks or darkened passageways, he cannot later be heard to complain if he receives injuries caused by those conditions, which he himself has sought.

This is no doubt true, and we agree with defendant that a tenant is entitled only to what he himself selects and to what he is willing to pay for, and, if we could be con-

vinced that it is the usual customary thing for courtyards in the Vieux Carre to be constructed with drains inadequate to carry off heavy rainfall and that it is usual and customary for such courtyards and passageways in that section to accumulate mud and fungus and that it is usual and customary for such conditions to be allowed to remain, then Estes was furnished just the type of courtyard and just the type of passageway he was entitled to receive. A tenant who leases a particular kind of property is justified in assuming that that property is constructed in the manner usually and ordinarily to be expected, without any defects other than those necessarily incident to or inherent in that particular type of property. A tenant who leases a building constructed of wood and sealed with wood cannot complain that his building is colder in winter than a modern tile or brick building, insulated with modern wall or cealing material, but he can complain if his roof leaks. Estes complains, not because the type of courtyard leased to him must always be dangerous, but because the particular one he leased, differing from others, was always, or at least often, slippery and dangerous due to conditions not prevailing in others, but peculiar to the one in question.

The conclusion which we have reached, that the courtyard was defective, seems also to have been reached by our brother of the district court, who, however, felt that plaintiff should have moved out of the apartment when he discovered that the yard was dangerous. In his reasons for judgment the district judge said: "When he knew the courtyard and the approaches thereto were dangerous, he should have demanded ingress and egress through the main door, the front door, and when that was refused to him he should have moved out of the house."

■ We shall hereafter discuss the defense based on the charge of contributory negligence resulting from the failure to use the front door, but for the moment shall consider the contention that Estes should have moved out of the house.

A somewhat similar contention was made in Ciaccio v. Carbajal, 145 La. 869, 889, 83 So. 73, 80. There the court stated defendant's contention on this point as follows: "It is argued, in effect, that, knowing the danger, plaintiff's remedy was either to have had a new tread substituted for that which was cracked, or to have moved out of the house."

In considering that contention, the Supreme Court said: "The suggestion that she

should move out is equally untenable. She had no time for house hunting, and the defendant had no right to compel her to do so, by failing to comply with his obligation; the consequences of such failure falling upon him, and not upon her."

In Labat v. Gaerthner Realty Co., Inc. (La. App.) 146 So. 69, 70, we found that the rule, as laid down by the Supreme Court, is: "* * * Knowledge of a generally defective condition is not sufficient to defeat an action by a tenant for damages caused by a defect, unless the particular defect which caused the injury is such as to indicate apparent, imminent danger. * * *"

Practically the same defense was made in Boutte v. N. O. Terminal Co., 139 La. 945, 72 So. 513, in which it was argued that there could be no recovery for the death of a tenant who, after learning of the defective condition of a balcony and rail, in a moment of forgetfulness leaned upon it and fell to the ground below and was killed. There the Supreme Court held that there could be recovery, in effect holding that there is no obligation on the tenant to vacate the defective premises.

This principle is recognized in Ruling Case Law, vol. 16, § 568, p. 104, in the following language: "It is generally held that the mere fact that a tenant is aware of the defective condition of a portion of the premises which it is the duty of the landlord to repair does not as a matter of law make it contributory negligence to continue the use of the same, if it reasonably appears that he might safely do so with the exercise of care."

■■ That Estes was using the rear entrance instead of the front entrance does not require us to deprive him of his right to recover, if it otherwise exists.

In the first place, as a matter of law, there was no reason for him to abandon the use of the rear passageway merely because he knew that it was more dangerous, unless the condition was so obviously dangerous as to impress the reasonably prudent person with the fact that its use would probably result in injury. There can be no doubt that the passageway was used by all other persons and that no one had, up to that time, been injured. Estes and his wife passed over that spot several times each day and, very evidently, on ordinary occasions it could be safely traversed by any one exercising reasonable care. In Ruling Case Law, Permanent Supplement, vol. 6, § 568, p. 4184, we find the following:

"The law will not compel a tenant to abandon use of the front entrance to his tenement merely because he knows that it is unsafe and a back entrance is available.

"A tenant occupying a room on the second floor of a building is not negligent as a matter of law in attempting to use a stairway to reach his room, which he knows to be old and dilapidated, in preference to a safer one which has been provided for him.

"Mere continued use by a tenant of common passageways after knowledge of their dangerous condition is not of itself conclusive evidence of lack of due care on his part.

"A tenant may in the exercise of care, to be determined in view of the extent and nature of the danger, continue to use a common stairway known by him to be unsafe, which is necessary for convenient access to his tenement.

"Knowledge by a tenant of a building of the defective condition of steps used by the tenants in common does not bar his right to recover for personal injuries caused by the defective condition."

But, as a matter of fact, the evidence raises a grave doubt as to whether the front entrance was available. The very interesting historic lock on the front door had broken, and there had been some controversy as to its replacement. In the meantime the door could not be used. We find it unnecessary to determine whether Estes should have replaced the lock, or whether Miss Kinsey should have done so. Estes was willing to replace it with one of a different and more modern kind, whereas Miss Kinsey insisted upon the repairing of the original lock. At any rate, under all the circumstances, Estes was not negligent in using the rear passageway.

■ We thus reach the final contention, which is that Estes was negligent in the manner in which he stepped upon the slippery surface of the bricks. In support of this contention counsel point out that Estes was at the time carrying two bundles of clothes, and they also suggest that he must have been careless, or he would not have fallen. The only actual evidence is that given by Estes himself, and he says that, realizing the danger, he took careful short steps, when suddenly one foot slipped or slid out in front of him.

We cannot conclude that the fall itself is proof of negligence on his part, because to do so would be to establish the rule that, where one is injured while using a route

known to be somewhat dangerous, but which may be traversed with proper care, injury is conclusive evidence of carelessness. The many cases to which we have referred and a score or so of others render this rule impossible of adoption by us. See Wise v. Lavigne, 138 La. 218, 70 So. 103; Landry v. Monteleone, 150 La. 546, 90 So. 919; Viola v. Convery, 10 La. App. 85, 122 So. 90; Gardiner v. De Salles, 13 La. App. 83, 126 So. 739.

We find no reason to disbelieve Estes' statement that he was walking as carefully as usual, but that his foot struck an unusually slippery spot. The facts, as we find them, are very similar to those set forth in a hypothetical case stated in American Law Institute's Restatement of the Law, vol. 2, c. 13, § 360, p. 977, which hypothetical case is stated as follows: "A leases an apartment in an apartment house to B. A step upon the common stairway by which the apartment of B as well as that of other tenants is reached, is to the knowledge of B and his family in bad condition but not in such a dangerous condition that a reasonable man would regard it as foolhardy to use the stairway. C, the wife of B, while ascending the stairway and exercising reasonable care to avoid harm from the defective step, slips upon it and is hurt. A is liable to C."

That he carried bundles does not necessarily show that the tenant was negligent. They were not large. It may be that he was careless, or that he ran or walked fast, but there is no evidence to this effect in the record, and it is not a necessary conclusion from the fall itself.

We conclude that there is no proof of contributory negligence.

We now consider the extent of plaintiff's injuries in an effort to determine the amount to which he is entitled. He claims nearly $10,000. He was painfully and seriously injured. Dr. Shute, the surgeon who operated on him at the Charity Hospital, describes the operation as follows: "I performed an operation for a fractured right patella on Mr. Estes, which consisted of making a longitudinal incision on the medial side of the patella, exposing the fragments of the patella, the separated fragments of the patella, uniting these fragments by the use of an iron wire inserted into the tendon above the upper fragment and the tendon below the lower fragment, so as to approximate the fragments and hold them together. In addition, the capsule of the patella was closed by a catgut suture, the fascia and skin then being closed in the usual manner."

After the operation at Charity Hospital, Estes was removed to the Hotel Dieu, a private institution in this city, and there he was placed under the care of Dr. H. Theodore Simon, an orthopedic surgeon.. Dr. Simon testified that plaintiff remained under his care for several months; that the operation did not prove to be a complete success; that the site of the injury became infected; and that it was necessary, for a considerable time, to permit pus to drain from the wound. He further testified that "the wire that was used to hold the knee-cap together is still in Mr. Estes' knee and, in my opinion, will eventually have to be removed before this drainage ceases." He further stated that two weeks before the trial he had again examined plaintiff's knee and that at that time "he had a fairly marked limitation of motion of the knee joint." He further stated that "a normal knee extends to a straight line, or 180 degrees, and flexes to about 35 degrees. Mr. Estes had complete extension to 180 degrees, but he had active flexion to only 100 degrees." With reference to the permanency of the disability, Dr. Simon said: "It is probable that he may recover some additional flexion, but it is very doubtful that he will recover full flexion, or anything like full flexion."

Dr. Battalora, a surgeon employed by defendant's insurance carrier, stated that such an injury is a very painful one, and he concurred with the views of Dr. Simon as to the seriousness of the injury and also that it would probably result in a permanent disability to move the knee beyond a range of 90 or 100 degrees.

Though a charge of $250 is made for the services rendered by Dr. Simon, the evidence does not show that that amount was charged by the said doctor. We note proof only to the extent of $200 on this item. Nor is there sufficient proof in the record that $63 was expended for medicines and drugs. All of the other items alleged are shown to have been expended, or to be due. We conclude that the total amount of actual expenses is $352 and that Mr. Estes sustained a loss in earnings of $150 per month for four months, or $600. We have concluded to allow the sum of $3,500 for the injuries sustained and also the actual loss of $952.05, or a total to plaintiff himself of $4,452.05. In arriving at these amounts we take into consideration the allowances made in McNabb et ux. v. Dugas (La. App.) 142 So. 174, and Van Baast v. Thibaut Feed Mills (La. App.) 151 So. 226.

Included in the charge of intervener is $150 for a surgeon's fee for performing the operation. There is some evidence to the effect that, in view of the financial condition of Mr. Estes, that charge is somewhat excessive, but we are of the opinion that it is not sufficiently excessive to authorize a reduction. The operation was quite a serious one. It was very skillfully performed, and we believe that $150 would be proper remuneration for the services rendered.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be and it is annulled, avoided, and reversed, and that there now be judgment in favor of plaintiff, Howard Estes, and against Miss Alberta Kinsey and Ætna Casualty & Surety Company, in solido, in the sum of $4,452.05, with legal interest thereon from judicial demand, and that there be further judgment in favor of board of administrators of the Charity Hospital of the State of Louisiana, and against Miss Alberta Kinsey and Ætna Casualty & Surety Company, in solido, in the sum of $159, with legal interest from judicial demand, and that defendants pay all costs in both courts.

Reversed.