On September 28, 1939, plaintiff William E. Bussey, instituted the present suit against the defendants, George E. Trew, Sr., George B. Trew, Jr., Warren Trew, Mrs. Evelyn Trew McBride, Mrs. Lois Trew Harris and Mrs. Lucille Trew Early, to recover of the defendants, in solido, the damages suffered by Mr. Bussey when he allegedly slipped through a hole in the kitchen floor of the premises, 1627 Park Avenue, in the city of Shreveport, and injured himself in his back and both legs.
Petitioner alleges that the plaintiff rented the house at 1627 Park Avenue to be occupied by himself and his wife, renting the same from the owners of the premises, defendants herein, through their common agent, George B. Trew, Sr., he having rented the same prior to the date of the accident.
The petition sets forth the interests of the defendants in the proportion of Mr. Trew, Sr., owning an undivided one-half interest and the other defendants owning an undivided one-tenth interest therein each.
The petition further recites that on the 22nd day of September, 1939, Mr. Bussey walked into the kitchen of the rented premises and stepped in front of the kitchen stove for the purpose of reaching above the stove to obtain a vessel from a shelf in which to heat some water to shave himself, and that when he so stepped, the floor gave way beneath him and his leg went through the hole in the floor up to his hip, causing the other leg to buckle under him and his weight to fall on the knee of this leg and twisted him so that his back was injured.
Plaintiff alleges that through the negligence of defendants, the floor of the kitchen had become decayed in the spot where plaintiff fell through the floor and gave way when plaintiff's weight was placed on this spot.
The defendants answered, setting up that Mr. Trew, Sr., owned a one-half interest in the property and held the legal usufruct on the other half, and that he had entered into the contract of lease of his own accord and for his own benefit, claiming that if there was any liability, he alone was liable and that the other defendants were not because, while they owned an interest in the property, such interest was burdened with Mr. Trew, Senior's usufruct, which had the effect of relieving the other defendants of any liability.
The further defense is made that Mr. Bussey had entered into an agreement with Mr. Trew, Sr., whereby Mr. Bussey bound himself to keep the house in good repair; and the answers further denied any liability on the part of defendants.
Also a plea of contributory negligence was alternatively filed because defendants claim that Mr. Bussey knew of the hole and was negligent in stepping into it.
Plaintiff sues for $10,000, plus interest.
The case was tried in the Court below on the issues thus formed, resulting originally in judgment in favor of plaintiff for $500, with interest and costs against George B. Trew, Sr., only, and rejecting plaintiff's demands as against the other defendants. Thereupon, the defendants moved for a new trial, which was granted, and, after the new trial was heard, the trial judge reversed himself and rendered judgment rejecting plaintiff's demands. From this judgment as rendered on the new trial, plaintiff has prosecuted an appeal to this court.
Plaintiff had been living in defendant's apartments for several years and had occupied the one in which he claims to have been injured for six months. Sometime prior to the time plaintiff moved into this apartment, a hole, approximately six or eight inches in diameter had been burned in the floor in front of and near to the kitchen stove. Whoever occupied the apartment at that time had placed a piece of galvanized iron or tin over the hole. It was never reported to defendant. Some time later a piece of linoleum was placed over the tin. There is a conflict of testimony as to whether or not the linoleum was covering the tin when plaintiff moved into the apartment. It makes no difference, however, for at the time of the alleged accident, the linoleum had rotted and the tin had rusted out. One side of the tin over the hole was flared up and on the ground underneath were coffee grounds and other *Page 497 
waste, which plainly showed that plaintiff or his wife had been using the hole to dispose of such waste.
Plaintiff spent much of his time in the kitchen. He was not employed and had been on relief for several years. He ate all of his meals in the kitchen and often slept there and it is most improbable that he did not know of the existence of this hole. In the light of the other untruthful testimony given by plaintiff, we are forced to place little credence in his statement that he did not know the hole was there.
The only eyewitness to the alleged accident was plaintiff himself. His story is as follows:
That at about 9:30 or 10 o'clock on the morning of September 22, 1939, he went into the kitchen for the purpose of shaving himself; that he walked to the front of the stove and reached for a vessel in which to heat some water. The vessel was on a shelf over the stove and that when he did so, the linoleum and tin covering the hole gave way and his right leg went through up to his thigh and his left leg was crumpled under him, causing his knee to strike the floor with such force as to severely injure it, and his back struck a table, causing injury to his back. That he fell backwards and was lying almost on his back. Plaintiff further testified that he fainted or became unconscious and could not extricate himself. He remained in this position until his wife ran out of the house and summoned four or five of his closest friends and associates who, upon their arrival, were unable to remove his leg from the hole until one of them went under the house and pushed it upward, while those in the house pulled. The only reason for such efforts could be due to the fact that the leg was wedged in the hole, for plaintiff only weighed approximately 125 to 130 pounds.
After removing plaintiff from the hole, he was placed upon a bed and a doctor called in who testified that he found an injury to the left knee, but the strange part about it is there were no abrasions or bruises of any kind on the right leg, although it is supposed to have gone through the ragged edges of a rusted piece of galvanized iron and to have been wedged as tight as is above related. The only treatment given plaintiff by the doctor was a dose of phenobarbital.
This entire story does not make sense and is most unreasonable. It causes us to give much weight to the testimony of a woman witness who lived in the adjoining apartment. She swore that plaintiff was behind with his rent and that defendant had ordered him to vacate and that plaintiff had made the statement the day before the alleged accident that if defendant did not "handle him with kid gloves", he would soon own the apartment.
The actions of plaintiff's wife when she ran out of the house seeking aid are also very strange. One of plaintiff's main witnesses, C.R. Powell, who lived just across the alley from plaintiff, testified that he was in the yard cutting grass. He was asked the following questions by plaintiff's attorney and gave the following answers:
"Q. How did you come to know about the accident — did you hear anything? A. Well, at the present time Mrs. Bussey passed my home, she was going over to Mr. Humphrey's. I says why are you running and she just kept on running. Says I will see you in a minute or two, something like that. I still kept cutting grass and Mr. Humphrey and this young man with Mr. Humphrey went up to Mr. Bussey's house and she said you come and go too. I didn't know what was the matter, I followed right on behind."
Just why Mrs. Bussey did not ask Mr. Powell to help until after she had gone farther and gotten plaintiff's closest friends and associates is not explained. It was not a natural act for a wife in distress.
The testimony of the four witnesses who were in the house when plaintiff is supposed to have been extricated from the hole is conflicting as to who did the pulling from that end. Furthermore, if plaintiff had been wedged in this hole up to his thigh as is claimed, it would have been impossible for him to be lying on his back or side. The only way his body could have reached the floor would have been to fall over face forward.
On the first trial plaintiff was asked the following questions by his attorney, to which he gave the following replies:
"Q. First I will ask you about this Standard Oil Company business — did you get hurt working for them? A. Yes, I got a wrench in my back.
"Q. How long ago was that? A. I don't remember — it has been 12 or 14 years back, I cannot recall the exact date.
"Q. Were you paid compensation? A. I think they gave me $73.00 compensation. *Page 498 
"Q. Did you have a suit. A. No suit.
"Q. Did you go to work thereafter? A. Yes.
"Q. Have any further trouble? A. No."
* * * * * *
"Q. Did you have any trouble with your back or knee at any time before you fell in this hole? A. No, none whatever.
"Q. It had nothing to do with your back or knee? A. No."
When defendant filed an application for rehearing, he attached several affidavits as to other injuries plaintiff had received and had been paid for. Then on the second trial plaintiff admitted other previous injuries. His testimony is as follows:
"Q. Mr. Bussey, in the former trial of this case, you remember you were questioned about an injury that you received while working for the Standard Oil Company 20 years ago, and you said that you received some compensation? A. Yes, sir.
"Q. Now, you were also asked if you ever had any trouble with your back and knee before you fell in the hole at Mr. Trew's house, and you stated that you did not. I will ask you if you understood that question. Just what did you understand me to ask? A. I understood you to ask me if I hurt my knee at the time that I hurt my back, at the time that I hurt my back while working for the Standard Oil Company.
"Q. Did you ever hurt your knee before you fell in the hole out there? A. Yes, sir.
"Q. Where was that? A. I went to a show and it was out there in front of Alphonse Brenner's store.
"Q. Out on Texas Avenue? A. Yes, sir.
"Q. How long ago has that been? A. 1936, I think.
"Q. You were hurt on the sidewalk? A. Yes, sir.
"Q. The insurance company paid you something then? A. Yes, sir, give me something over $50.00 for it.
"Q. The same knee that you hurt this time? A. Yes, sir.
"Q. How long did you stay in bed from that injury? A. Possibly ten days."
And admitted other injuries as follows:
"Q. Is it not true that you sustained several other injuries besides this injury of August 1, 1936? A. I have had several little minor injuries in my lifetime.
"Q. Did you collect from injuries sustained by either one of the bus lines, for the bus running over you, or injuring you? A. Yes, but they did not run over me.
"Q. Were you injured in any way by a bus or on a bus? A. Yes, sir.
"Q. What kind of injury? A. Me and my wife had been down to Shreveport and I was living at Texarkana at that time and going out we had a wind storm, no one on the bus except me, my wife, baby and the driver of the bus. I was sitting in the middle of the car and the driver asked me to close the window, and there was a broken coca cola bottle, and I fell and injured my arm a little.
"Q. How much did you collect for that? A. $300.00.
"Q. Do you remember what year that was? A. No, sir, but six or eight years ago.
"Q. Did you collect for injuries from any railroad company at any time? A. Yes, sir, 30 years ago I sued a railroad company.
"Q. Do you remember what was the nature of those injuries? A. Yes, sir, fell through an overhead bridge, injured my leg.
"Q. How much did you collect for that injury? A. $1700.00.
"Q. Was your back injured at that time? A. No, sir.
"Q. Both injuries to leg? A. My foot in the fall on the railroad. Was injured while working for the Standard and the Bus one time, the railroad one time.
"Q. You were injured out here during August, 1936. A. Yes, sir.
"Q. Now all of the injuries have resulted from your stumbling and falling? A. I have stated how each occurred."
Plaintiff seemingly is an intelligent man and his explanation that he misunderstood the question propounded to him on the first trial by his attorney cannot be accepted by us. There was nothing confusing in the question.
In the case of Smith v. St. Raymond et al., La.App., 170 So. 379, 381, the Court said: "Generally, in these cases, involving injuries to tenants by reason of vices and defects existing in the lessor's premises, the court is compelled to rely entirely upon the plaintiff's evidence, for *Page 499 
the reason that the plaintiff and his witnesses are the only persons present when the accident occurs. Because of this fact, the evidence tendered by the plaintiff should be scrutinized with utmost care in order to avert consequences which might unduly encourage the prosecution of fictitious claims."
The soundness of this rule cannot be questioned and certainly the evidence offered in this case by plaintiff and his witnesses will not bear close scrutiny.
The lower court did not give written reasons for its decision but we feel sure it believed as we do that the claim made by plaintiff is a fictitious one.
The judgment of the lower court is therefore correct and is affirmed with costs.