JANVIER, Judge.
At abput’9:30 or 10:00 o’clock in the morning on December 20th, 1950, Mrs. Lillie Mae Harris Denneker, one of the plaintiffs, while descending the steps leading to the ground from the front porch of an apartment building in which she and her husband, as tenants, occupied an apartment, fell down the steps to the ground below and sustained serious physical injuries. She and her husband, Sherman Denneker, brought this suit for damages against the defendants, Mr. and Mrs. Joseph Pecoraro, alleging that they are the owners of the premises in which the accident occurred, and that the cause thereof was the failure to maintain the premises in proper condition. Plaintiffs particularly alleged that the premises were defective in that the owner of the property had nailed to the front edge of the porch at the top of the steps a “piece of tin, measuring approxi *511 mately three inches wide and forty-six inches long, * *
Plaintiffs also alleged that it had rained earlier on that morning, and that rain water had accumulated in the overhead gutter attached to the roof of the porch, and that the gutter had leaked “with the result that water had dropped on the said strip of tin, making same slippery and unsafe.” They also alleged that
“it was the obligation of defendants to maintain the said premises in a safe and proper condition, either by refraining from installing a piece of material such as the said strip of tin, or by preventing the leaking of the said rain water, or both.”
Mrs. Denneker prayed for judgment for $23,500 for her pain and suffering, for the fracture of her right radius, a chip fracture of the head of the left radius, and permanent injury to her right arm. Mr. Denneker prayed for judgment for $249.-58 for expenses resulting from the treatment of Mrs. Denneker and for the cost of a new dental plate. Alternatively, in the event it should appear that Mrs. Pecoraro alone owned the premises, plaintiffs prayed for judgment against her alone.
Defendants answered, averring that plaintiffs had occupied an apartment in the said premises for a period of five years prior to the occurrence of the accident and that
“at no time during such period of occupancy have plaintiffs complained of or raised any question concerning any defective condition of the premises, or any dangerous condition of the stairs,”
and defendants also averred that Mrs. Den-neker’s fall
“was occasioned solely by her own negligence in failing to use such care in descending the steps as would be used by the ordinarily reasonable person,”
and
“in attempting to descend the steps in a rapid manner contrary to and in disregard of reasonable prudence, and in failing to avail herself of the use of the handrails on said steps.”
In the alternative that it should appear that there, was any defect in the premises, defendants averred that the accident had been .caused solely by the contributory negligence of Mrs. Denneker.
After an extended trial, there was judgment in the Civil District Court for the Parish of Orleans dismissing the suit, and plaintiffs have appealed.
At the request' of counsel for plaintiffs, the District Judge rendered written reasons as follows:
“Because there is in this case a direct conflict between the testimony of plaintiff and some of 'her witnesses on the one hand, and the defendants and some of.their witnesses on the other hand, which raises a question of verac-» ity, counsel for plaintiff has asked that I assign the reasons which caused me to dismiss this suit.
“I rendered judgment dismissing plaintiff’s suit because I came to the conclusion that plaintiff did not establish by a preponderance of the evidence and with the certainty which the law requires that she was injured as a result of any vice or defect in the leased premises. The plaintiff’s case is based on the theory that she slipped on the metal nosing of the last riser on the edge of the porch while attempting to descend the front stairway of the leased premises. She contends that at the time of the accident this metal strip was wet from rain water which dripped down back of the awning which covered the stairway, because of deterioration of some of the timber in the roof above.
“Plaintiff produced as a witness a reputable architect who testified that in his opinion it was not good building practice to install this type of metal nosing. He stated: ‘A metal nosing is often used in construction inside a building and outside as well, but whenever a metal nosing is used it is always of a nonskid type.’ He further stated: T believe that the sheet metal . used could be hazardous in the sense that it *512 is a slippery material when wet.’ On the other hand, witnesses who used the premises for many years testified that no accident had ever happened there and that the sheet metal was. not slippery.
“Before deciding the case I visited the premises at the request of counsel for both sides and made tests in the presence of counsel and the litigants under all possible conditions.. I found that while rainwater could not drip on the metal strip from the alleged defective part of the roof, rainwater nevertheless could drip upon the metal strip through the crack between the awning and the building in the event of a driving rain. However, I found it possible to stand upon this, strip, even when wet, without slipping, and that the tin strip was not slippery under any conditions. Eight different tests were made, which included all possible conditions, namely, with' the tin with paint upon it, and with the paint removed, with the tin dry and with the tin covered by water, and with the person descending the stairs standing on one foot on either the leather portion of the shoe or on the rubber heel, and in all instances with full pressure applied and without the support of the railing.
“In my opinion the plaintiff did not prove that her fall was caused by contact between her foot and the tin. No one but she witnessed the inception of her fall. That she did fall is confirmed by several witnesses. Mrs. Charles Le-tellier saw her sitting on the bottom step with her mouth bleeding. Mrs. Leonard Robles, her sister, who was called after the accident and after plaintiff had already .been removed to the hospital, sáw ‘a puddle of blood on the concrete by the front step.’ Francis E. Landry, who was in his apartment, heard her scream and upon coming out found her on the cement at the bottom of the stairs in front of her apartment. John Capretto, a defense witness, saw something rolling down the steps ‘five, six or seven steps’ from the bottom. Other defense witnesses arrived shortly after plaintiff was carried upstairs. The only witness, how.ever, who gave any testimony with respect to the beginning of the fall was the plaintiff herself, and it is significant to note that she herself did not state positively at any time that her foot slipped when it came in contact with the tin strip, although she expressed the opinion that this must have been the cause of her fall. She testified: ‘Well, I came out the door and I started toward the steps, and I reached over for. the banist.er — it is a column post, a round post — and I reached over for the banister, and. as I did my foot suddenly slipped from underneath. I believe that at the time it must have been damp or wet.’ She said further: T knew the tin was a smooth piece of tin before that but it is not to say really slippery, only when it is damp or .wet.’ Again: T never noticed how wet or how damp it -was. When I slipped I suddenly realized the tin must have been wet.’ Also : ‘Well, when I walked out I saw the damp porch, and as I reached around to catch the banister I slipped and I realized that the tin must have been wet to cause me to slip.’ On rebuttal, plaintiff gave this testimony :
“Q. You don’t know where you were standing when this accident happened ? A. I walked over to reach the rail on the right-hand side.
“Q. You walked over to reach the rail on the right-hand side ? A, That’s right.
“Q. Then what happened? A. In other words, in order to reach the rail I had to stand sideways to reach it.
“Q. Then what happened? Á. Well, I slipped and I went on down the steps.
“Plaintiff at no time stated as a fact .(as distinguished from an opinion) that her foot slipped when it was applied to the tin strip.
“Mrs. Louise Steele, a defense witness, who arrived immediately after the accident says that plaintiff said: T *513 don’t know if I got dizzy and fell or whether I stumbled.’ Mrs. Mary E. Thompson, another defense witness, says that plaintiff’s husband told her that plaintiff ‘didn’t know how she had fallen, whether or not she had a dizzy spell or she stumbled on the step or what.’ The defendant says that plaintiff when asked by her sometime after the accident about the fall said, ‘She didn’t know’ how she had fallen, ‘everything just seemed to have blacked out in front of her.’ Plaintiff denied making these statements and says that immediately after the accident, when asked what happened, she answered: ‘I slipped on that piece of tin and fell down the stair,’ whereupon she was asked ‘Are you sure you wasn’t dizzy ?’, to which she answered, ‘No, I wasn’t.’ She could not explain why she was asked about the dizziness at that time by a friendly neighbor.
“In the case of Smith v. St. Raymond, La.App.1936, 170 So. 379, later followed by Bussey v. Trew, La.App. 1941, 2 So.2d 495, the Court of Appeal for the Parish of Orleans stated:
“ ‘Generally, in these cases, involving injuries to tenants by reason of vices and defects existing in the lessor’s premises, the court is compelled to rely entirely upon the plaintiff’s evidence, for the reason that the plaintiff and his witnesses are the only persons present when the accident occurs. Because of this fact, the evidence tendered by the plaintiff should be scrutinized with utmost care in order to avert consequences which might unduly encourage the prosecution of fictitious claims.’ [170 So. 381.]
“Measured by this test, the proof in this case falls far short of establishing the fact that the plaintiff slipped as a result of her foot’s coming into contact with the metal strip, or that there was any vice or defect in the leased premises.
“This case therefore does not come within the ruling in Estes v. Aetna Casualty & Surety Company [La. App.], 157 So. 395; and the suit must be dismissed.”
Counsel for plaintiffs assail the reasons given by the District Judge, especially on the ground that they result largely from certain tests which were made by the District Judge under conditions which it is asserted were not the same as those which existed at the time of the accident.
The record and the reasons given by the District Judge show clearly that he made his tests under all different conditions which might have existed, and he concluded “that the tin strip was not slippery under any conditions.”
The record is voluminous, and it would serve no useful purpose to discuss in detail the conflicting evidence as to whether or not the strip of metal was slippery, as to whether or not rain water could find its way to the said strip, as to whether or not it was raining or had rained on that morning, and as to whether or not Mrs. Denne-ker suffered from dizzy spells and might have fallen as a result of dizziness. We shall, however, refer briefly to some of the evidence.
In spite of the very extraordinary evidence that the handrail to the right could be reached only with difficulty and after the person descending the stairs had descended for one or two steps, the pictures which are in evidence and the other testimony convince us that the handrail could be easily reached by any person exercising-ordinary care. Other tenants in the apartment building and other persons using the stairway so testified. Mrs. Anna Free, who occupied one of the apartments, when asked whether she had any difficulty in “reaching the rail on the righthand side,” answered, “None whatever.” It is true that Mrs. Free did not move into the premises until sometime after the occurrence of the accident, but it is conceded that the rail was in the same position and condition in which it was at the time of the accident.
Mrs. Mary E. Thompson, who occupied an apartment in the building and who used the same stairs, was asked, “What difficulty, if any, did you encounter in leaving *514 the porch and grasping the _rails?” She answered, “There’s no difficulty at all.”
Mrs. Arthur Simons, Jr., who also resided in the premises, was asked if she encountered any difficulty “in using that stair and reaching that' rail * * and she answered, “None whatsoever.”
As to whether or not the strip of metal constituted a danger, some of the witnesses testified that it did and others testified that it did not. It is true that an architect, who testified on behalf of plaintiffs, said that the use of such a strip was dangerous, but our examination of the photographs and the other testimony in the record convinces us that there would have been no danger to any one descending the steps who did so with ordinary care and took ■ ordinary precautions.
There is considerable' evidence concerning the physical condition of Mrs. Denne-ker before the accident occurred and indicating that she had suffered from dizzy spells and concerning the manner in which Mrs. Denneker customarily made use of the steps in question.
Mr. John Capretto, who operated a store nearby, said that some time before the accident in his store Mrs. Denneker had “complained about once in a while she gets a dizzy spell.” Mrs. Thompson stated that Mrs. Denneker had talked to her about her condition and that she had said “that she suffered with dizzy spells * *.” She also said that after the accident she had asked Mrs. Denneker “how she had fallen,” and that Mrs. Denneker answered, “she didn’t know whether she had one of her dizzy spells or not.” Mrs. Simons said that some time before the accident she had talked to Mrs. Denneker “concerning her general health,” and that she had an-' swered that “she suffered with dizzy spells.” Mrs. Louise Steele stated that after the accident, Mrs. Denneker had told her: “I don’t know if I got dizzy or fell or stumbled.”
Furthermore, there is considerable evidence to the effect that Mrs. Denneker was customarily' careless in using the steps. Mrs. Thompson was asked to describe the manner in which Mrs. Denneker made use of the steps, and she answered, “Well, as a rule, she bounces.” She testified that she had often seen Mrs. Denneker come up and down the stairs, and she said:
“She never did hold on. Her husband made a remark to me on several occas-sions ‘It is a wonder she didn’t break her neck.’ ”
Mrs. Steele was asked if she had ever observed the manner in which Mrs. Denne-ker made use of the steps, and she answered :
“I saw her coming down many times and I heard her husband telling her ‘You better be careful or you will fall down the steps.’ because she used to run down the steps.”
She further said that very often Mrs. Den-neker’s husband “cautioned her about running down the porch.”
We have not attempted to quote at length from any of the witnesses, and it must be conceded that other witnesses who testified on behalf of plaintiffs contradicted the witnesses for defendant in many particulars. All that we have attempted to show is that there is ample testimony which, if true, would justify the findings of the District Judge, and that consequently it cannot be said that his findings are manifestly erroneous.
As to whether the metal strip was slippery and dangerous, the evidence, as we have said, is conflicting, and it is true that the architect made a statement that in his opinion it was not good architectural practice to use such a strip. Our conclusion is that while it might have been better architectural practice not to have used such a strip, its use did not create an unusual hazard, and that by the use of any care at all, Mrs. Denneker could have safely descended the steps under the conditions which existed on that morning.
In Lawson v. D. H. Holmes Co., La.App., 200 So. 163, 165, we were confronted with a situation which, to some extent, resembled that which is presented here. It is true that there the plaintiff was a patron in a downtown store in New Orleans, which store was the defendant, and that there was not involved the same obligation of *515 safety which is due by a landlord to a tenant or to persons who may be legally on leased premises. Still certain observations made by us in that case are pertinent here. There a patron slipped on an iron step leading from the store exit to the adjacent sidewalk, and it was contended that it was bad architectural practice to make use of such a metal strip. The architect who testified on behalf of plaintiff expressed the opinion that “the passageway is not constructed properly and that this type of entrance is not used in modern buildings.” As to the effect of such testimony in situations of this kind, we said:
“ * * * It is always apt to remark that Mr. [-’s] opinion is not entitled to greater weight (nor is it to be regarded as more expert) than any lay witness in the case for anyone who sees the slab and walks over it is fully able to judge its condition.”
In that case we found that though the step may have been made slippery by rain, that was not the cause of the accident.
To hold defendant liable here would be tantamount to a holding that all rental property must be constantly maintained in the best possible architectural condition, and that whenever it appears that some condition, though reasonably safe, might be improved by modern changes, liability results if such changes are not made.
In Lawson v. D. H. Holmes Co., supra, we said:
“ * * * The fact that it had been raining and that the vestibule was wet undoubtedly caused the passageway to be slippery but this, of itself, cannot be plausibly advanced by plaintiffs as an argument to hold the defendant liable for their mother’s death. On the contrary, Mrs. Lawson knew that it was raining and she is to be charged with knowledge of the fact that one is apt to slip upon any wet surface. * * ”
We quote with approval from S. S. Kresge Co. v. Fader, 116 Ohio St. 718, 158 N.E. 174, 175, 58 A.L.R. 132, as follows:
“Not every accident that occurs gives rise to a cause of action upon which the party injured may recover damages from some one. Thousands of accidents occur every day for which no one is liable in damages, and often no one is to blame, not even the ones who are injured. * * * ”
Our conclusion is that the evidence does not preponderate towards showing that the fall of Mrs. Denneker was caused by the fact that she stepped on the metal strip. We also conclude that the evidence shows that the premises were reasonably safe and the accident would not have occurred had Mrs. Denneker observed ordinary care in making use of the steps.
The judgment appealed from is affirmed at the cost of appellants.
Affirmed.