John Mobry, the lessee of the premises No. 2321 Spain Street, in the City of New Orleans, brings this suit against Mrs. Barbara Ebert Frazier, the owner and lessor of the leased premises, claiming $2,149.20 as damages for physical injuries alleged to have been caused by a fall due to defective steps.
It is asserted that, on the morning of Sunday, May 7, 1939, at about the hour of 7:45 o'clock, as he attempted to descend the front steps leading from the leased premises to the street, "* * * said steps became detached from their position and caused petitioner to lose his balance and fall heavily to the ground; that such steps did not collapse, but `wrenched' themselves from the facing board by which they were attached to the house; that said board was rotten and in such bad condition that it could not hold said steps in their proper position."
As a result thereof, he alleges that he sustained injuries consisting of a sacroiliac strain. It is also alleged that the defective condition of the steps was due to lessor's failure "to keep the premises * * * in a safe and livable condition."
Defendant admitted the ownership of the property and denied that any defects or vices existed in the premises, unless such as would arise from the fault and negligence of the lessee. She seeks an avoidance of liability on the ground that, if an accident, as alleged, occurred, any damages occasioned thereby were solely as a result of the negligence of plaintiff in that he was aware of said defects and vices and for which he was solely responsible. In the alternative, she pleaded contributory negligence in bar to recovery in that plaintiff, with a full knowledge of the condition of the steps, used them, and this in a negligent manner.
There was judgment below in favor of plaintiff for $500, and defendant has appealed. Plaintiff has answered the appeal, praying that the award be increased to $1,050.
On the morning on which the accident occurred, plaintiff was leaving his home and, on reaching the front steps leading to the sidewalk, he says: "I * * * went to step on the step, the steps left the house, and I fell and struck my back, and I was assisted in by two gentlemen."
The evidence shows that, when the steps fell, precipitating plaintiff to the ground, one John N. Danner, then driving his truck along Spain Street delivering milk to his customers, had reached a point opposite the residence of plaintiff. He saw plaintiff, who he had known for several years, *West Page 558 
leaving the porch, heard the crash, and saw plaintiff fall to the ground. He stopped his truck as quickly as possible, jumped out and went to his aid. On reaching him, plaintiff was lying on the ground, complaining of a severe pain in the region of his back. Danner attempted to lift plaintiff and, because of the difficulty in so doing, he called upon a passer-by, named Vicknair, to assist him. It is shown that Danner and Vicknair carried plaintiff along the alley leading to the rear entrance of the residence into his bedroom, assisted him to undress and helped him to his bed. Both Danner and Vicknair testify that, when they reached plaintiff, the steps were lying flat on the sidewalk pavement, about two to three feet from the front porch, and that plaintiff was lying on the left side of the steps leading from the home. It is further shown, according to their testimony, that, upon examination of the plaintiff's back, they found no bruises or contusions, but a reddened surface of which plaintiff was complaining. Both witnesses further testified that, upon leaving plaintiff's residence, they examined the fallen steps and found that, instead of having a standard facia board for the connection between the steps and the sill of the porch, a rough tongue and groove ceiling board had been used, and which at that time was in a very decayed condition. It is shown that decayed pieces of this ceiling board were found on the ground, having been pulled loose from the sill when the steps "wrenched" loose. We are convinced of the defective condition of this ceiling board, for it appears that the real estate agent of defendant, on reaching the premises shortly after the accident for the purpose of replacing the steps, removed the remnants of the ceiling board still attached to the sill of the porch, and substituted a standard facia board, a method of construction, which, for reasons of safety, should have been originally observed.
The record convinces us that the steps "fell, or wrenched loose" when plaintiff proceeded to descend them, causing him to be precipitated to the ground. The contention of learned counsel for defendant that we should not attach any credence to this proof because of the conflict and discrepancies shown in the testimony of the witnesses tendered by plaintiff is without merit. These discrepancies are of matters of an inconsequential nature and do not affect, what we consider, the main facts at issue. Unquestionably the accident occurred as charged, resulting from defective premises, and the remaining question is that of defendant's alternative plea of contributory negligence.
We fail to find any evidence which would give the slightest support to defendant's contention that plaintiff knew of any vices or defects in the steps. He testified that at no time did he have the slightest suspicion of any dangerous condition then existing, much less actual knowledge of such a fact. This knowledge, relied upon by defendant, finds its only support in the testimony of plaintiff's wife to the effect that she knew that the steps were "shaky" and had previously complained of that condition on two occasions. However, the knowledge of his wife of a given condition may not be imputed to plaintiff without sustaining proof that such knowledge was brought to his attention. There is nothing from which we can conclude that the steps were so defective as to render the user thereof guilty of contributory negligence. This identical defense has been made in several cases, in each of which the defendant lessor has contended that the knowledge of the injured party that there was a defective condition should prevent recovery for injuries sustained subsequently, but, as we held in the case of Hughes et al. v. Abate, 2 So.2d 68, 70: "* * * unless there is evidence which would indicate the defect to be so serious as to endanger the life or body of the user, the courts have held that the continued use thereof does not constitute contributory negligence".
See, also, Boutie v. New Orleans Terminal Company, 139 La. 945, 72 So. 513, 516; Danove v. Mahoney et al., La.App., 176 So. 404, 405. Under such circumstances, we would not be justified in holding that he was guilty of contributory negligence.
The liability of defendant, in view of the foregoing facts and conclusions, is well established. To determine such liability, it is not necessary that the lessor have actual knowledge of the defects or unsafe condition of the leased property. Knowledge is imputed to him.
The articles of the Revised Civil Code relative to the obligations of the lessor are Nos. 2692 and 2695, which read as follows:
"2692 * * *. The lessor is bound from the very nature of the contract, and without any clause to that effect: *West Page 559 
"1. To deliver the thing leased to the lessee.
"2. To maintain the thing in a condition such as to serve for the use for which it is hired.
"3. To cause the lessee to be in a peaceable possession of the thing during the continuance of the lease."
"2695 * * *. The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same."
Convinced as we are that the vices and defects existed in the premises; that these vices and defects caused the injury of the plaintiff in his use of the leased premises, without any fault or negligence being attributable to him in that connection, we cannot avoid the conclusion that the lessee is entitled to recover, from his lessor, indemnification for any loss which he has suffered.
Plaintiff sustained a sacroiliac strain. This is amply established by the testimony of the medical experts. Dr. Cabibi, presented by plaintiff, testifies that he was called to plaintiff's home on the morning immediately following the accident, and on arriving found him in acute pain in the region of the sacroiliac joint. His diagnosis of the injury was "a sacroiliac sprain, pulled muscles of the back, possibly some subluxation (loosening of the ligaments) of the sacroiliac joint". He administered a sedative and strapped plaintiff's back for purposes of immobilization. He again visited plaintiff on May 11, 1939, administering heat treatments to the injured region. Between May 14 and June 3, 1939, plaintiff received four treatments at his physician's offices, the latter date being the last medical attention received by him, he being then advised to obtain a sacroiliac belt for future comfort.
Dr. Logan, presented by defendant, examined plaintiff two days after the accident. His examination disclosed "a strain of the left lumbar muscle with a possible sacroiliac slip on that side". He found plaintiff's side "still very sore on pressure" and it was his opinion that the injury was not severe or permanent.
Plaintiff was confined to bed periodically for several days. At the time of the accident he was employed as a checking clerk by the WPA, though by trade a painter foreman, earning $57.20 per month. He reported for work ten or twelve days after the accident, being forced, after a day or two, to stop working as a result of the attending pain. He testified that he returned to work on June 6, 1939, and his employment has not since been affected as a result of the accident. At the time of the trial he was gainfully employed at wages of $150 to $175 per month.
In Moeller v. Morgan's Louisiana Texas R.R. S.S. Co., 7 La.App. 559, the plaintiff suffered from a slight separation of the sacroiliac joint and was still wearing, at the time of the trial, nine months later, a seven-inch canvas belt with steel ribs, and straps under his leg. We allowed recovery of $1,000 for his injuries, but this award included $300 for loss of salary.
In McGehee v. Hines, 12 La.App. 13, 124 So. 846, our brothers of the First Circuit allowed $1,200 for injury in the sacroiliac region. However, though the specific amounts are not stated, the award covered medical expenses and loss of wages.
In Synigol v. Oury, 17 La.App. 163, 134 So. 324, the plaintiff sustained injuries in the sacroiliac region which necessitated strapping. He suffered considerable pain and lost six weeks' earnings, in addition to property damage. We allowed recovery of $490 and, after eliminating the items of actual damage, as distinguished from physical, the recovery for the sacroiliac injury alone was approximately $300.
In Hoffman v. Zimmer, La.App., 175 So. 115, the plaintiff, a lessee, fell on defective steps of the leased premises. She sustained a sacroiliac sprain, which was described as mild. We awarded her $750 for her injuries.
In Hughes et al. v. Abate, La.App., 2 So.2d 68, the plaintiff, a sub-tenant, was injured when the steps of the leased building gave way. She sustained a sacroiliac strain which was not particularly serious. She was treated for over two months by her physician and was confined to bed for about six weeks. Her physician found it necessary to strap her back as a result of considerable suffering. We allowed the plaintiff $400 for her injuries. *West Page 560 
The medical expenses incurred by plaintiff for treatment as a result of his injuries, in accordance with Dr. Cabibi's testimony and the bill rendered, is shown to be $50, and we do not find the charges unreasonable.
We conclude that plaintiff's injuries were mild, nor was there any serious impairment of his normal physical functions other than for a period of one month, at which time he resumed his employment. Under the facts presented, we have concluded to amend the judgment rendered below by increasing the amount awarded to plaintiff to $607.20, this amendment to cover the medical expenses of $50 and the loss of one month's wages of $57.20.
The judgment appealed from is amended by the increase of the amount awarded to plaintiff, John Mobry, to $607.20. In all other respects, the judgment is affirmed, at the cost of the appellant.
Amended and affirmed.