BLANCHE, Judge.
This is a suspensive appeal from a judgment rendered in favor of plaintiff, Barry W. Tewis, and against defendant, Zurich Insurance Company, for damages in the sum of $15,248, including $248 for medical expenses, with legal interest thereon from judicial demand together with all costs. Plaintiff filed suit against defendant alleging that on February 12, 1966, while he was a lessee of an apartment at the Studio Arms VI Apartments in Baton Rouge, he sustained personal injuries when a concrete slab on which he had stepped slipped from under him causing him to fall. Suit was *358 brought against defendant as the liability insurer of the owner of the premises. From the aforementioned judgment in favor of the plaintiff, defendant perfected this suspensive appeal.
The trial judge adequately summarized the factual situation giving rise to this accident, and his findings of fact and disposition of issues pertaining to liability are reproduced herein as follows:
“In this particular case the plaintiff was a tenant at the Studio Arms apartments in the City of Baton Rouge and on February 12, 1966, he was attempting to go from his apartment to his automobile in the parking lot. He was accompanied by Mrs. Verna Fransen, his date. He left his apartment, went down a staircase which was convenient to his apartment, and upon reaching the bottom proceeded across the sidewalk which was covered by an overhang of the building, and then sought to cross an area between the sidewalk and the parking lot which was composed of earth on what was essentially a slope or slant. Placed upon this few feet of ground were two concrete slabs approximately eighteen by twenty-four inches in size. These had been placed there, according to the testimony of the present manager of the apartment complex, to prevent the erosion of soil. Photographs offered in evidence do show rather substantial erosion and deterioration of this area over a period of time. Also in this area were shrubs spaced around the entire apartment complex. The apartment complex itself contained four levels of apartments and was more or less on a square arrangement. The evidence is not clear as to the exact size, but it would appear that it might be somewhere in the neighborhood of eighty to ninety yards in each direction. From the plaintiff’s apartment he could have taken a different exit, that is, down the walkway from the second-floor apartment to an elevator, and he would have gone some thirty feet additional distance had he chosen that particular exit. It was customary, however, for him to park opposite the stairwell that he used and to walk from the parking lot up onto the sidewalk using the aforesaid concrete slabs.
“I believe there was testimony to the effect that the elevators from the stairwell would have been some seventy and ninety yards, respectively, away. This is not to say, as I think I have already explained, that the elevator was that distance from his apartment.
“As the plaintiff stepped onto the second of these concrete slabs, going toward the parking lot, it slipped with him causing him to fall. He did not fall completely to the ground but caught himself or braced himself in some manner as the slab slipped downward and away from him. He had turned, almost simultaneously with this slipping of the concrete slab, to assist his date down the same route. Each of them apparently intended stepping onto these slabs to get to the parking area.
“The testimony shows that prior to that time, at that time, and subsequent thereto as well as at the present time, there are tenants living in this apartment complex who use not only this particular method of gaining entrance to the building but who use other similar arrangements. The exact amount of usage is certainly not clear from the record. Mr. Bates, the present manager, testified that at the time of the incident most of the tenants were relatively young people and that as of today most of them are what might be termed young people.
“The plaintiff takes the position that the concrete slab which caused him to slip is an appurtenance to the principal building, that it is a part of the premises which was defective and which did cause him to fall. The defendant, we understand, takes the position that this is an ordinary slip-and-fall case. I think the distinction here is that it was not the plaintiff who slipped, but it was the concrete slab which itself slipped or moved under his foot. It would' appear to the Court that this was defective, that it had been. used for this purpose with the knowledge of the owner *359 of the premises, not only by the plaintiff but by other people.
“We might ask ourselves whether or not, due to the weather conditions on the day in question, this particular plaintiff assumed the risk since this area was on an incline and it might be presumed to be more dangerous under these conditions; and, whether this would cause a reasonably prudent person to choose the safer method, that is, walking down the walkway and the use of either one or the other of the two elevators to get to the entrance.
“There is nothing in the record with regard to the lighting conditions at the time of the accident. The accident occurred at approximately six or six-thirty P. M. on February 12th, and in one instance has been described as ‘at about dusk.’ We think from the evidence there was not that insufficiency of lighting which would be an element in determining any assumption of risk or contributory negligence.
“We are impressed with the fact that the physical design of this building is such as to encourage the use of these steps in traversing the distance between the parking lot and the sidewalk. There are only two regular entrances at two corners of the building, diagonally across from each other. These entrances are by the two elevators in the building. There are, however, staircases which afford an exit down to the ground level at other points. We do believe that the management of the building, knowing that these steps were being used for the purpose of traversing between the parking lot and the building was placed on notice that should the steps not be secured they would likely cause a fall and some resulting injury to one of the tenants.
“We cannot honestly believe that these steps were anything but an invitation to use, being placed as they were in areas in the immediate vicinity of the stairwells as well as around other portions of the building. It is not unreasonable to believe that a tenant of the building would park his automobile in that portion of the lot most convenient to his own apartment and that in so doing would use these concrete slabs that had been placed there by the owner.
“We hold that the slab was, in effect, part of the premises and that placed there in the manner which would permit rain and weather to cause it to move under the foot pressure of a tenant constitutes a breach of the duty owed by the owner to the tenant. The difficult question that we have had to decide in this case is whether or not the use of these steps, under the prevailing weather conditions and considering the physical nature of same, was such as to place the plaintiff on notice that they were dangerous or that they might in some way cause him injury. We do not think so, considering the fact that this plaintiff had used them almost uniformly to gain entrance to his apartment from the parking lot and that other people likewise used them. This, of course, was with the knowledge of the owner — and we say that if the owner did not know this he certainly should have known it. Mr. Bates testified that there are still people using these particular steps.
“ * * * We do think you understand that we are holding in this instance that the premises were defective, that this caused the injury to the plaintiff, and that he did not assume any risk nor was he contributorily negligent because these steps were there for the use of the tenants and they were customarily used by at least some of the tenants for the purpose that the plaintiff was using them on the date in question.” (Oral Reasons for Judgment, Record, pages 27 through 31.)
Inasmuch as this is a suit by a lessee against his lessor for injuries sustained on the leased premises, the following summary of legal principles is applicable :
“Under the provisions of LSA-C.C. Article 2695, the lessor is liable in damages to his tenant for injuries to the latter resulting from vices or defects in the leased premises. The liability provided *360 for in the above numbered article extends not only to vices or defects in the apartment occupied by the lessee but also to the accessories thereto including the entrance, courtyard, stairways and approaches used in common with other tenants. Estes v. Aetna Casualty & Surety Co., La.App., 157 So. 395; Bates v. Blitz, 205 La. 536, 17 So.2d 816.
“The fact that a landlord or lessor may be unaware of a vice or defect in the leased premises does not exonerate him from liability for injuries occasioned thereby. Thompson v. Moran, 19 La. App. 343, 140 So. 291; Mobry v. Frazier, La.App., 4 So.2d 556. Knowledge alone on the part of the injured party that the premises were in a defective condition or contained a vice does not per se preclude his action for recovery of damages. Gray v. Succession of Spiro, La.App., 14 So.2d 92; Gilliam v. Lumbermens Mutual Casualty Company, 240 La. 697, 124 So.2d 913.
“On the other hand, however, the landlord is not the insurer of his tenant’s safety and the tenant who claims damages for injuries allegedly occasioned by a vice or defect in the leased premises bears the burden of establishing his claim to a legal certainty by a fair preponderance of the evidence. Davilla v. Richardson, La.App., 120 So.2d 293.” Sabin v. C & L Development Corporation, 141 So.2d 482, 485 (La.App. 1st Cir. 1962).
The liability imposed upon the lessor in favor of the lessee is classified as strict liability for defective leased premises, with the result that the lessor cannot successfully defend a personal injury action by his lessee on the basis of ignorance of the condition of the building or of the fact that the defects could not be detected, Phillips v. Cohen, 183 So.2d 473 (La.App. 4th Cir. 1966), writ refused, 249 La. 196, 186 So.2d 158. Accordingly, the mere existence of defective premises can suffice to hold defendant liable in this case.
From our review of the record we are satisfied that the trial court committed no manifest error in concluding that the leased premises were defective as stated by the trial court, that such defective condition caused the accident and resulting injuries suffered by the plaintiff and that plaintiff’s recovery should not be barred by virtue of contributory negligence, assumption of risk or improper use of the leased premises. The evidence, including the photographs, certainly supports the conclusion of the trial court that there was a gap in the shrubbery which gave the appearance of being an appropriate place to exit and that the concrete slabs would reasonably lead one to believe that they were so placed as to facilitate such use and passage, of which use and passage defendant’s insured was well aware. Under rainy conditions these concrete slabs became dangerous to the tenants by virtue of their tendency to slip or give way under foot, thereby giving rise to a defective condition of the premises.
We feel the instant case is similar to Estes v. Aetna Casualty and Surety Company, 157 So. 395 (La.App., Orleans Cir. 1934), wherein the Court held that a brick walk in a courtyard common to tenants was defective in being improperly drained, customarily rendering the walk slippery after a heavy rain because of growth of fungus and an accumulation of mud, as a result of which the landlord was liable to a tenant for injuries resulting from a fall on the walk after a rain. In this case the same argument as is presently being made by counsel for defendant was raised; namely, that the tenant should have used a safer means of passage. The Court held that the failure of the tenant to abandon use of the brick passageway did not bar recovery where the dangerous condition was not so obvious as to impress a reasonably prudent person that use of the passageway would probably result in injury. The Court pointed out in Estes that the passageway was used by other persons and no one had up to that time been in *361 jured. The record in the case before us likewise reflects that the passageway used by plaintiff had been used successfully by him on numerous prior occasions, and was likewise used by other tenants to the knowledge of defendant’s insured. Under the circumstances, we do not feel plaintiff was unjustified in using this admittedly much more convenient passageway to the parking lot, and his use thereof did not constitute an inordinate use of the leased premises. Nor do we feel from a review of the record that defendant has proven an affirmative defense of contributory negligence or assumption of risk. We find nothing that unusual or unreasonable in the conduct of the plaintiff at the time of this accident, and we feel the trial court committed no manifest error in concluding defendant had failed to prove an affirmative defense.
Defendant further complains that the trial court committed manifest error in awarding plaintiff general damages in the sum of $15,000. The trial court’s reasons given in conjunction with this award of quantum are reproduced below:
“Relative to the injury sustained by the plaintiff, we place most reliance upon the testimony of Dr. J. Willard Dowell. Certainly his diagnosis of the injury is entitled to more weight in this case than the testimony of the other two experts who testified. I will not go into any great detail relative to the injury, but Dr. Dowell said that the plaintiff sustained what he called disc trouble. The first sacral nerve root was involved, the disc in question pressing upon the nerve. Insofar as the result is concerned, Dr. Dowell stated that he .did not deem the particular terminology important, whether it were called a herniated disc or something else. In essence, the disc trouble is there and there is nerve involvement. This, according to Dr. Dowell, resulted in a five to ten percent disability of the body as a whole, this being a permanent disability. We do note that the plaintiff went to an osteopathic physician a total of thirty-two times and that he unquestionably sustained great pain from time to time and, from time to time, found his body in a rather distorted position because of the injury. This is not, of course, unusual considering the nature of the injury; but it is indicative of the pain and suffering which one sustains in these instances.
“The Court believes that an award of $15,000.00 would be proper for the injury sustained, the pain and suffering past and future, and the permanent disability suffered by the plaintiff.” (Oral Reasons for Judgment, Record, p. 31)
While we are of the opinion that the trial court’s award of damages is most generous, we cannot agree with appellant’s contention that it amounts to a clear abuse of the great discretion vested in the lower court, LSA-C.C. art. 1934(3); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967); Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963), and we will, therefore, not disturb the award. To the limited extent that awards of damages in other cases are relevant, it will be seen that while in certain cases awards of lower quantum have been upheld for comparable injuries, Martinez v. United States Fire Insurance Company, 203 So.2d 425 (La. App. 2d Cir. 1967); Thibodeaux v. Sternberg, 164 So.2d 606 (La.App. 3rd Cir. 1964), other cases have permitted awards of greater quantum for comparable injuries, Gaspard v. LeMaire, cited supra; Waller v. King, 188 So.2d 231 (La.App. 2d Cir. 1966). The award of damages by the trial court in this case does not constitute a clear abuse of the discretion vested in the trier of fact for the injuries and disability found. The judgment is affirmed with all costs assessed to the defendant.
Judgment affirmed.