LOTTINGER, Judge.
This is an automobile accident case wherein the Trial Court found in favor of plaintiffs, Thomas E. Maggio and Vincent Robert Maggio, and against the defendant, William E. Nichols and his insurer. The Trial Court awarded Thomas E. Maggio $1,444.20 as damages, and Vincent Robert Maggio $20,103.00. It is from the award to Vincent Robert Maggio that the defendants-appellant have appealed, and Vincent Robert Maggio has answered the appeal seeking an increase. The Trial Judge gave well written reasons for judgment, which we now quote in their entirety:
“This is a suit in tort resulting from an automobile collision on October 24, 1967 in East Baton Rouge Parish between an automobile being operated by Vincent Robert Maggio, and owned by his father, Thomas E. Maggio and a vehicle being operated by Sue R. Nichols.
At the time of suit Vincent Robert Mag-gio was the minor son of Thomas E. Mag-gio and Nannie Wooten Maggio. He was born on July 18, 1949 and lived with his father and mother and had never been emancipated. Accordingly, Thomas E. Maggio brought this suit individually and as administrator of the estate of his minor son. After suit was filed, Vincent Maggio became legally emancipated when he married on August 16, 1969. Before the court is Thomas E. Maggio claiming the damages he sustained to his automobile and the medical expenses which accrued prior to the date of Vincent’s emancipation. Also, Vincent Robert Maggio, hereafter referred to as plaintiff, has now been joined as a party plaintiff and seeks damages for his own expenses and injuries.
Liability was not stipulated but was not seriously contested; the facts indicate that the collision occurred at the intersection of Edinburgh and Tupelo Streets in the City of Baton Rouge. Edinburgh Street runs north and south and has the right-of-way. Tupelo Street runs east and west and a stop sign controls its traffic at said intersection. Just prior to the accident plaintiff was driving north on Edinburgh Street. As he approached the intersection a car being driven in an easterly direction on Tupelo by Sue R. Nichols either failed to stop at the stop sign or failed to yield the right-of-way after stopping at the stop sign. The Nichols’ automobile struck the Maggio vehicle broadside on the left. The Maggio vehicle continued north and struck a third vehicle which was proceeding in a southerly direction on Edinburgh Street.
No evidence was presented as to any improper driving on the part of Mag-gio. The Court must find that the sole proximate cause of the accident was the negligence of Sue R. Nichols. She failed to keep a proper look-out. Further, she failed to keep her vehicle under proper control.
*660 It was stipulated between counsel that the Aetna Insurance Company insured the Nichols’ vehicle for public liability, and that the limits of liability were $50,000.00 per person and $100,000.00 per accident for bodily injuries and $5,000.00 for property damage.
It was stipulated that the value of the Maggio vehicle, which was a total loss after the accident, was $950.00. It was further stipulated that the total expenses of Thomas E. Maggio, as reflected in Exhibits P-1 through P-11, was $1,444.20. Thomas E. Maggio is entitled to judgment for that amount.
The real question to be decided in this case is the amount of quantum to be awarded to plaintiff. Immediately after the accident, plaintiff was seen at the Baton Rouge General Hospital emergency room by Dr. Hutchinson, who repaired a laceration to plaintiff’s leg with five stitches. At that time, Dr. Hutchinson also saw a contusion on the chin and abrasion on the arm. Two days later plaintiff complained to Dr. Hutchinson of low-back pain. Dr. Hutchinson found questionable muscle spasm. After seeing him a total of six times he referred plaintiff to an orthopedic surgeon whom he believed, to be Dr. Smith, however, the evidence later revealed that the orthopedist that plaintiff did see was Dr. Cranor.
Dr. Cranor, an orthopedic surgeon, saw plaintiff on January 10, 1968. Plaintiff’s complaint was of low-back pain. Dr. Cra-nor made no objective findings and took no x-rays. He did testify that plaintiff suffered discomfort upon full flexion. Dr. Cranor’s diagnosis based on the history given to him by plaintiff was a lumbo-sacral sprain.
On April 5, 1968, plaintiff went to see Dr. Frank Rieger, a general practitioner. Plaintiff complained that he suffered low-back pain which affected his sleep and physical activities. Dr. Rieger’s examination indicated tightness in the low-back and a loss of motion in the back of flexion. He also found an increase in the lordotic curve and pain on leg raising. His diagnosis was a lumbo-sacral strain with additional pathology which he believed to be a disc. Dr. Rieger treated plaintiff conservatively for two and a half years and sent him to see various physicians. He had seen plaintiff at least twenty-eight times. Dr. Rieger never hospitalized plaintiff; placed no restrictions upon him; prescribed no traction and took no x-rays personally. Dr. Rieger, either personally or through his office personnel, gave plaintiff approximately twenty-three injections which were primarily for obesity.
Dr. Campanella, an orthopedic surgeon, saw plaintiff in April of 1968. Plaintiff complained of low-back pain which was localized with no radiation. Dr. Campanella found an increased lordotic curve and tenderness to palpation over the lumbo-dorsal area. On the initial visit Dr. Campanella was of the opinion that plaintiff sustained a strain of the low-back and gave him medication in the form of muscle relaxants. A lumbo-sacral back support was also prescribed for him. Dr. Campanella saw plaintiff again on May 2, June 24, and July 9 of 1968. On the last occasion plaintiff also complained of severe pain radiating into both lower extremities. Dr. Campanella’s examination at that time revealed some diminished sensation in the lower extremities so he referred the plaintiff to Dr. John Hopper for a neurologicial evaluation. Dr. Campanella’s final diagnosis was a chronic low-back sprain and assessed a 10% disability of the back as a result thereof.
Dr. John Hopper, a neurologist, saw plaintiff on November 2, 1968. Plaintiff’s complaint to Dr. Hopper was of constant low-back pain and transient inability to use his legs. Dr. Hopper testified that he gave plaintiff a complete neurological examination and found no evidence of any neurological deficit. The x-rays taken by Dr. Hopper revealed a congenital abnormality in the sacral area. The x-rays showed no narrowing of disc spaces.
*661 In June of 1969, Dr. Rieger referred plaintiff to Dr. Homer Kirgis, a neurosurgeon associated with the Oeschner Clinic. Dr. Kirgis examined plaintiff initially on June 6, 1969. Dr. Kirgis at that time found, by x-ray,. a narrowing of the disc spaces on the L-4 and L-5 levels. Dr. Kirgis felt that plaintiff might have a mid-line herniation but because of plaintiff’s good range of movement did not feel that he should be hospitalized for .myelography. Dr. Kirigis felt that if plaintiff followed his recommendations conservative treatment would enhance chances for excellent results. Dr. Kirgis recommended that plaintiff lose weight and sleep on a hard bed.
A year later on June 12, 1970, Dr. Kirgis saw plaintiff again. At the time of this examination, plaintiff had lost 30 pounds. Plaintiff at this time complained of pain radiating into the posterior aspect of the right thigh. Dr. Kirgis’s findings on this examination were more positive than on the previous occasion. He found a moderate degree of restriction which was not present initially. He found that the straight leg raising tests were positive on the right at 80° and on the left at 90°. New x-rays showed no significant changes. Dr. Kir-gis still did not recommend surgery because he wanted plaintiff to lose more weight and to continue sleeping on a hard bed. Dr. Kirgis felt that the discs at L-A and L-5 were definitely pathologic and not normal.
On December 15, 1970, Dr. Kirgis examined plaintiff again. He found an increase in the lordotic curve. The leg raising tests were more positive than in June of 1970. He examined many of the x-rays taken by the physicians previously mentioned. Based on his examinations and his review of all of the x-rays he felt that plaintiff definitely had ruptured discs at the L-4 and L-5 levels. He also found that the horizontal tilt of plaintiff’s sacrum was causing problems. The sacrum is the base of the spinal column and is designed to carry the weight of the entire spinal column. This abnormal tilt of the sacrum weakened plaintiff’s back even more, according to Dr. Kirgis. Based on his entire evaluation he placed a 30% disability of the body on the plaintiff. He still felt hopeful that conservative treatment would do the job and would not recommend myelography or surgery. If surgery became necessary, a minimum of two discs would have to be removed which would decrease the disability to something in the neighborhood of 15 to 20%. Additionally, removal of the discs might necessitate a spinal fusion because of the developmental problem with the horizontal tilt of the sacrum. Dr. Kirgis felt that if a spinal fusion became necessary that a 25% disability would have to be assigned.
Dr. William Smith, an orthopedic surgeon, was the only physician to testify on behalf of the defendant. His initial examination of plaintiff was on August 7, 1968. At that time Dr. Smith found a normal lordotic curve; his x-rays were within normal limits and his conclusion was that there was no objective findings of injury at that time.
On March 4, 1970, x-rays taken by Dr. Smith gave some suggestion of narrowing of spaces posteriorly but Dr. Smith could find no objective signs of a disc at that time. Also at that time he had the benefit of Dr. Kirgis’ original report and conclusions that plaintiff may have had a mid-line herniation at the L-4 and L-5 level. Dr. Smith found no significant changes between his initial examination on August 7, 1968 and his subsequent examination on March 4, 1970. On cross-examination Dr. Smith conceded that narrowing might not show up even by March 4, 1970. He also conceded that if x-rays taken after that date showed a narrowing it would certainly be suggestive of a disc.
From the medical testimony adduced, and as set forth here in digest form, the court feels that plaintiff has clearly shown by a preponderance of the evidence that he suffered a significant injury in the automo *662 bile accident of October 24, 1967, i. e., the rupture or narrowing of the lumbo-sacral intervertebral discs at the levels of L-4 and L-5.
Plaintiff at the time of the accident had just begun Louisiana State University as a freshman. The eviednce indicated that he had been on the Lee High School golf team. He was most anxious to become a member of the LSU golf team. After the date of his accident his scholastic career declined to the extent that by the 2nd semester of his freshman year he was terminated from LSU for scholastic reasons. He testified that he had a difficult time attending classes because his back continued to hurt. The evidence also indicated that since the date of the accident his golf game has suffered until it is now non-existent and he has not even attempted to play golf for more than two years.
Before the accident, plaintiff helped his father in a service station which his father owned and operated. After the accident, he did only very light work at the service station. In July, 1969 plaintiff went to work for Smith-Carona as a salesman. In January of 1970, he went to work at Goudchaux’s Department Store as a clerk and worked there for several months. Then he began work at the Capital Bank and Trust Company as a bookkeeper and has continued to be employed at the Capital Bank since that time. The evidence indicated that plaintiff has lost little or no time from any of these jobs for any reason at all.
This is a somewhat difficult case to analyze insofar as quantum is concerned. The Court is satisfied that plaintiff has sustained the burden of proof and has shown that he presently has ruptured interverte-bral discs at the L-4 and L-S level. The Court is also satisfied that this disc disease has been a progressive one which very slowly manifested itself objectively.
During the period of time before Dr. Kirgis’ x-ray findings and diagnosis the plaintiff continued to complain of pain in his low-back, however, none of the customary and usual conservative treatment measures were ever taken. For instance, plaintiff was never confined to a hospital; only questionable muscle spasm was found at any time and this was on one occasion several days after the accident by the original treating general practitioner; he was never placed in traction; no restrictions were ever placed upon his activities; no myelogram was ever performed upon him; and he has lost little or no time from work. Notwithstanding these factors the Court has Dr. Kirgis’ very strong pronouncement that as far as he felt unquestionably the plaintiff had two herniated discs. With these facts in mind the Court has reviewed the jurisprudence in an effort to obtain some guideline to assist it in assessing quantum.
In Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149, plaintiff sustained a 25 to 30% compression fracture of the first lumbar vertebra together with other problems which were aggravated by the accident. The plaintiff was in the hospital for 3J4 weeks; then she stayed at home for one or two weeks in bed; and she wore a back brace. The Supreme Court said that $19,-000.00 was not excessive.
In Waller v. King, La.App., 188 So.2d 231, the plaintiff was hospitalized for approximately twelve weeks during a great considerable portion of which she was in traction. Three myelograms were performed as were two operations for herniated discs. Her injuries were characterized as severe, painful and disabling. The Court of Appeal affirmed an award of $20,-000.00 in this case.
In Hyatt v. Hartford Accident & Indemnity, Co., La.App., 225 So.2d 102 the testimony indicated that the orthopedic surgeon who examined plaintiff on June 15, 1966, found no objective signs of injury or disability except for a slight increase in the lordotic curve. Another orthopedic surgeon who examined plaintiff on March 26, 1966, found symptomatic evidence of a *663 herniated disc in the right lumbar spine area and he recommended a myelogram. However, since plaintiff was able to do and was doing work as a carpenter he felt that he should continue to do so.. The Court of Appeal agreed with the trial judge who reasoned that there should not be a great deal of difference between an award of a probably herniated and an award for an actual herniated disc and affirmed an award of $7,500.00.
In Summers v. Hartford Accident & Indemnity Co., La.App., 229 So.2d 744, the First Circuit affirmed an award of $10,000.00 to a woman who suffered a fracture of the 3rd lumbar vertebra and who had relative minor contusions of the knees and umbilicus area.
In Tewis v. Zurich Insurance Company, La.App., 233 So.2d 357, the First Circuit affirmed an award of $15,000.00 for a herniated disc which the orthopedic surgeon estimated resulted in a 5 to 10% disability of the body as a whole.
The most recent case is Fourcard v. George Theriot’s Inc., La.App., 241 So.2d 789. The plaintiff was seen on many different occasions by various physicians. The accident occurred on January 15, 1968. The plaintiff was hospitalized and still suffered from considerable spasm upon her discharge on January 31. On February 19, she was rehospitalized and placed in traction for a period of 8 days. The initial treating physicians felt the plaintiff had suffered a lumbo-sacral sprain and found no evidence of a herniated disc. On August 22, a neurosurgeon from Houston examined the plaintiff and after his examination found no evidence of nerve irritation and no ruptured intervertebral disc. On October 14, the plaintiff was examined by an orthopedic surgeon whose findings indicated the possibility of a herniated disc. He conducted a myelogram and found a small defect at the L^4 level which consisted of a protrusion of the disc. He recommended a laminectomy and a fusion operation. After recapitulating the various physicians’ testimony the Court of Appeal found no abuse of the trial judge’s discretion in awarding the plaintiff $10,000.00 for injuries.
Taking into consideration of the extent of plaintiff’s injuries and in particular the rupture of the intervertebral discs at D-4 and L-5, the estimates of disability ranging from 10% by Dr. Campanella back in July, 1968 to the 30% disability evaluation assigned by Dr. Kirgis in December, 1970 and the possibility of future surgery which might even entail a spinal fusion the Court feels that an award of $20,000.00 should do substantial justice to this plaintiff.
The Court makes no award to plaintiff for damages resulting from his inability to finish college. The Court does not feel that same resulted from his inability to attend classes because of his low back pain. The evidence discloses very clearly that this plaintiff has been able to hold a job almost continuously since July, 1969. He could have continued his studies at LSU just as easily as he has held down a full-time job.
Any loss resulting to plaintiff as a result of his golf game being impaired and the expenses attached to any future surgery are included in the general award of damages.
Additionally, plaintiff asks for an award for impairment of his earning capacity. The Court feels that the plaintiff has not established by a clear preponderance of the evidence that there has been any impairment of his earning capacity in this case.
Through stipulation, counsel agreed that plaintiff had become obligated for a total of $103.00 in medical expenses since his emancipation. He is entitled to recover this amount in addition to the award for general damages for a total of $20,103.00.”
Defendants-appellants contend that the Trial Court erred in making a grossly excessive award to the plaintiff-appellee. They further contend that Vincent Maggio *664 has never been hospitalized; has never been placed in traction; has not had any loss of earnings; has married since the date of the accident and is presumably leading a happy married life; and does not anticipate surgery for correction of any alleged defects.
The defendant-appellant, in oral argument, advances the theorem that since the defendant has appealed and the plaintiff has answered the appeal, this Court can now adjust the award without regard to whether there has been an abuse of discretion of the Lower Court and cites as his authority therefore Sharp v. St. Tammany Parish Hospital, 190 So.2d 500 (La.App. 1st. Cir. 1966).
So that there will be no misunderstanding in the matter, what we said or intended to say in the above cited case was, that when one of the dissatisfied parties appeals from a judgment rendered and is asking for a review of the award of damages and the appellee appeals or files an answer to the appeal and he likewise asks for a review of the award granted, that then the Court of Appeal has the right to increase or decrease the award appealed from, depending on the facts, provided the Appellate Court first finds as a fact that there has been an abuse of discretion of the trial authority, whether it be the Trial Judge or jury.
Our jurisprudence is now firmly established to the effect that “much discretion” must be left to the Trial Judge or jury in the assessment of damages in torts. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149; Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127; Ballard v. National Indemnity Company, 246 La. 963, 169 So.2d 64.
In applying the doctrine as set forth in the above cited cases, the Supreme Court, in Miller v. Thomas, 258 La. 285, 246 So.2d 16, reinstated a $60,000 judgment of the Lower Court which had been reduced by the Appellate Court to $25,000 saying:
“From these decisions, two principles emerge: (1) To modify the amount of an award for general damages, an appellate court must find that the trial judge or jury has abused the ‘much discretion’ accorded by the codal provision; (2) The awards in other cases serve only as an aid in determining whether there has been an abuse of discretion and rivet no steel frame of uniformity.”
The codal provision to which the court referred, is Civil Code Article 1934, Subd. 3, which provides, in part, as follows:
“In the assessment of damages under this rule, as well as in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury . . .”
As to the award by the Trial Court of $20,000.00 for disability and injuries, we do not find the Trial Court in error, and affirm same.
For the above and foregoing reasons, the judgment of the Trial Court is affirmed at appellant’s costs.
Judgment affirmed.